# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **KRISTIN BROWN,** | § | |
| on behalf of herself and all others | § | |
| similarly situated, | § | |
| **CHARLES AMES, NORMA BAZAN,** | § | |
| **MARIA BRANCH, MONTY BUHROW,** | § | |
| **AMANDA COFFEY, CHERRY DAVIS,** | § | **No. 4:15-CV-613** |
| **PAYAM DELL, BRYAN EGGLESTON,** | § | **CLASS ACTION** |
| **JANICE EGGLESTON, JEFF** | § | |
| **FLETCHER, AMY FORD, KATHRYN** | § | |
| **FREED-COLLIER, JULIE GLOVER,** | § | |
| **TERANCE GRISSO, PATRICIA** | § | |
| **HENDERSON, DEBORAH JOHNSON,** | § | |
| **RENEE JOLLEY, JARED JULIAN,** | § | |
| **MYRON KIMBALL JR., MARK LANE,** | § | |
| **JENNIFER LEDBETTER, ADAM LUCK,** | § | |
| **RILEY MASSEY, VENISA** | § | |
| **MCLAUGHLIN, ADAM MILLER, ROXIE** | § | |
| **ROLL, ELLIOT SMITH, KATHLEEN** | § | |
| **SMITH, CYNTHIA SPIGEL, SUZANNE** | § | |
| **STEVENS, and KEVIN WALDEN,** | § | |
| Plaintiffs. | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TEXAS A&M UNIVERSITY** | § | |
| **SCHOOL OF LAW,** | § | |
| **DEAN ANDREW P. MORRISS,** | § | |
| individually and in his official capacity, | § | |
| **TEXAS WESLEYAN UNIVERSITY,** and | § | |
| **PRESIDENT FREDERICK G.** | § | |
| **SLABACH**, | § | |
| individually and in his official capacity, | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT - CLASS ACTION

1.      Plaintiffs in this action seek a declaratory judgment of trademark non-infringement and license regarding their use of A&M trademarks, § 1983 damages for irrational discrimination, negligence for their failure to reasonably protect plaintiffs' interests when transferring Texas Wesleyan University School of Law from one defendant to the other, and contract damages against defendants for their disavowal of plaintiffs as graduates of Texas A&M University School of Law.

### I.   NATURE OF THE CASE

2.      In summer of 2013, Texas A&M University System ("TAMU") purchased Texas Wesleyan University School of Law ("TWU School of Law") and renamed it the "Texas A&M University School of Law" ("TAMU School of Law"). TAMU School of Law then announced it would no longer recognize pre-acquisition graduates as its alumni. This decision has damaged the disavowed graduates, who have lost the ability to easily show that their juris doctor degrees are valid to potential employers and clients, as their law school is no longer easily located on many lists of accredited law schools.

3.     This suit seeks to require TAMU School of Law to recognize the disavowed graduates based on *estoppel*. TAMU could have started its own law school, but having chosen to purchase one and backdate its accreditation to 1994, capitalizing on the bar results, hours of pro bono service, and other accomplishments of its pre-acquisition graduates, TAMU School of Law cannot now treat pre- and post-acquisition graduates differently. TAMU School of Law must complete the name change process it began by recognizing all its graduates in the same way, and reissue diplomas to those graduates whose work TAMU School of Law uses for recruitment daily.

## II.   PARTIES

### A.   *Plaintiffs*

4.     Lead Plaintiff Kristin R. Brown graduated from the Law School in 2013, during which time she won the Equal Justice pro bono award with approximately 1300 hours (about 1% of the Law School's total pro bono hours). She resides in Dallas, TX, and can be contacted through Plaintiffs' counsel.

5.    Plaintiff Charles E. Ames graduated from the Law School in 1995. He resides in Addison, TX, and can be contacted through Plaintiffs' counsel.

6.    Plaintiff Norma A. Bazan graduated from the Law School in 2008. She resides in Fort Worth, TX, and can be contacted through Plaintiffs' counsel.

7.    Plaintiff Maria Jackson Branch graduated from the Law School in 1998 and is currently an elected official. She resides in Houston, TX, and can be contacted through Plaintiffs' counsel.

8.    Plaintiff Monty J. Buhrow graduated from the Law School in 2003. He resides in Hurst, TX, and can be contacted through Plaintiffs' counsel.

9.    Plaintiff Amanda M. Coffey graduated from Law School in 2009. She resides in Denton, TX, and can be contacted through Plaintiffs' counsel.

10.    Plaintiff Cherry L. Davis graduated from the Law School in 2002. She resides in Gig Harbor, WA, and can be contacted through Plaintiffs' counsel.

11.     Plaintiff Payam Ghassemi Dell graduated from the Law School in 2007. He resides in Dallas, TX, and can be contacted through Plaintiffs' counsel.

12.     Plaintiff Bryan Eggleston graduated from the Law School in 2010. He resides in Spicewood, TX, and can be contacted through Plaintiffs' counsel.

13.     Plaintiff Janice Eggleston graduated from the Law School in 2010. She resides in Spicewood, TX, and can be contacted through Plaintiffs' counsel.

14.     Plaintiff Jeff Fletcher graduated from the Law School first class of graduates in 1993. He resides in Quitman, TX, and can be contacted through Plaintiffs' counsel.

15.     Plaintiff Amy Theresa Ford graduated from the Law School in 2012. She resides in Rowlett, TX, and can be contacted through Plaintiffs' counsel.

16.     Plaintiff Kathryn Freed-Collier graduated from the Law School in 2000. She resides in New Windsor, MD, and can be contacted through Plaintiffs' counsel.

17.    Plaintiff Julie Glover graduated from the Law School in 2009. She resides in Lucas, TX, and can be contacted through Plaintiffs' counsel.

18.    Plaintiff Terance Grisso graduated from the Law School in 1994. He resides in Colleyville, TX, and can be contacted through Plaintiffs' counsel.

19.    Plaintiff Patricia Donovan Henderson graduated from the Law School in 1994. She currently resides in Grapevine, TX, and can be contacted through Plaintiffs' counsel.

20.    Plaintiff Deborah Johnson graduated from the Law School in 2005, during which time she chaired the Law Fellowship Board of Directors; participated in the Mediation Competition, becoming a Regional Finalist; volunteered with National Adoption Day; and volunteered with juvenile mediation. She resides in North Richland Hills, TX, and can be contacted through Plaintiffs' counsel.

21.    Plaintiff R. Renee Jolley graduated from the Law School in 2005. She resides in Denton, TX, and can be contacted through Plaintiffs' counsel.

22.   Plaintiff Jared Julian graduated from the Law School in 2001, where he served as President of the Student Bar Association. He resides in Dallas, TX, and can be contacted through Plaintiffs' counsel.

23.   Plaintiff Myron Eugene Kimball, Jr. graduated from the Law School in 1996. He currently resides in Arlington, TX, and can be contacted through Plaintiffs' counsel.

24.   Plaintiff Mark Lane graduated from the Law School in 1998. He resides in Fort Worth, TX, and can be contacted through Plaintiffs' counsel.

25.   Plaintiff Jennifer Browning Ledbetter graduated from the Law School in 2011. She resides in Rowlett, TX, and can be contacted through Plaintiffs' counsel.

26.   Plaintiff Adam Luck graduated from the Law School in 2013. He resides in Dallas, TX, and can be contacted through Plaintiffs' counsel.

27.   Plaintiff Riley C. Massey graduated from the Law School in 2011. He resides in Dallas, TX, and can be contacted through Plaintiffs' counsel.

28.     Plaintiff Venisa McLaughlin graduated from the Law School in 2003. She currently resides in Granbury, TX, and can be contacted through Plaintiffs' counsel.

29.     Plaintiff Adam Miller graduated from the Law School in 2010. He resides in Crowley, TX, and can be contacted through Plaintiffs' counsel.

30.     Plaintiff Roxie Roll graduated from the Law School in 1997. She resides in Stafford, TX, and can be contacted through Plaintiffs' counsel.

31.     Plaintiff Elliott Smith graduated from the Law School in 2011. He resides in McKinney, TX, and can be contacted through Plaintiffs' counsel.

32.     Plaintiff Kathleen Hennessey Smith graduated from the Law School in 2004. She currently resides in Southlake, TX, and can be contacted through Plaintiffs' counsel.

33.     Plaintiff Cynthia Cooper Spigel graduated from the Law School in 2005. She resides in Dallas, TX, and can be contacted through Plaintiffs' counsel.

34.    Plaintiff Suzanne Stevens graduated from the Law School in 2007. She resides in Denton, TX, and can be contacted through Plaintiffs' counsel.

35.    Plaintiff Kevin Ray Walden graduated from the Law School in 1995. She resides in Spring, TX, and can be contacted through Plaintiffs' counsel.

36.    Hereinafter, plaintiffs are collectively referred to as "Pre-Acquisition Graduates" or "Plaintiffs."


**B.    Defendants**

37.    Defendant Texas A&M University School of Law ("TAMU School of Law") is a component of Texas A&M University. TAMU Law is located at 1515 Commerce Street, Fort Worth, TX 76102, and may be served via any authorized agent at the same address.

38.    Defendant Andrew P. Morriss, Dean of Texas A&M University School of Law, is an individual residing in Texas. He may be served at his office located in the Dean's Suite at Texas A&M University School of

Law, 1515 Commerce Street, Fort Worth, TX 76102, or wherever he may be found.

39.   Defendant Texas Wesleyan University ("TWU") is a domestic, nonprofit corporation. TWU is located at 1201 Wesleyan Street, Fort Worth, Texas 76105, and may be served via any authorized agent at the same address.

40.   Defendant Frederick G. Slabach, President of Texas Wesleyan University, is an individual residing in Texas. He may be served at his office located at 1201 Wesleyan Street, Fort Worth, Texas 76105, or wherever he may be found.

41.   This Complaint will use "Law School" to denote the academic institution generally, without necessarily referencing its owner or name at any particular time.

## III.   JURISDICTION AND VENUE

42.   This court has personal jurisdiction over this class action in that:

   a. Plaintiff Kristin Brown is a resident of Texas.

   b. Defendant Texas A&M University School of Law is located in Fort Worth, Texas.

c. Defendant Andrew P. Morriss is a resident of Texas.

d. Defendant Texas Wesleyan University is a Texas corporation.

e. Defendant Frederick G. Slabach is a resident of Texas.

43.   Plaintiffs seek a declaration of rights with respect to federal trademark laws and bring a claim for deprivation of rights. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 (federal question), 28 U.S.C. § 2201 (declaratory judgment), 15 U.S.C. § 1051, et seq., (the Lanham Act), and 42 U.S.C. § 1983 (civil action for deprivation of rights).

44.   This Court has supplemental jurisdiction over Plaintiffs' state claims for breach of contract, breach of the duty of good faith and fair dealing, negligence, and tortious interference under 28 U.S.C. § 1367(a) because these claims are so related to Plaintiffs' federal claims which are within this Court's original jurisdiction, that the claims form part of the same case or controversy under Article III of the United States Constitution.

45.   Venue is proper in Tarrant County. Section 85.18(b) of the Texas Education Code states that venue for suits filed against any component or officer of the Texas A&M University System is mandatory in the

county in which the primary office of the chief executive officer of the component, as applicable, is located. Texas A&M University School of Law and Dean Andrew P. Morriss are located in Tarrant County.

46.   Plaintiffs herein claim that the statute of limitations on their claims is extended by the discovery rule, based on the September 12, 2013 Q&A session hosted at the Law School

## IV.   CLASS ACTION ALLEGATIONS

47.   Plaintiff Kristin Brown brings this action on behalf of herself and all persons who graduated from the law school known as Texas Wesleyan School of Law ("TWU School of Law") from 1994 until its sale to Summer of 2013 by Texas Wesleyan University ("TWU") to Texas A&M University ("TAMU"), when it was renamed to "Texas A&M University School of Law" ("TAMU School of Law").

48.   Plaintiff Brown alleges on the basis of information received by the State Bar of Texas that this class of persons consists of approximately 3000 persons.

49.   All plaintiffs are from the defined class and represent all years of operation of TWU School of Law, stretching from 1994 to May 2013.

This Complaint may refer to the defined class as the "Pre-Acquisition Graduates."

50.    The claims set forth in this complaint are common to each class member, each of whom received a degree from the Law School prior to its purchase by TAMU and subsequent renaming.

51.    Plaintiff Brown is a proper representative of this class of persons because, as will be more fully shown below, her claims are typical of the claims of all members of the class, and these claims are not subject to any unique defenses, and no interest of Plaintiff Brown in this litigation conflicts with other class members.

52.    The claims set out below are proper for certification as a class action under the provisions of Rules 23(b)(1)(A), 23(b)(1)(B), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

53.    Plaintiffs expect to prove damages exceeding $5,000,000.

54.    The questions of law and fact common to the class predominate over any questions affecting individual members because the damages done to all proposed class members are very similar, and the proposed remedies are also similar, which include equitable relief regarding the

reissue of diplomas and storage of educational records. The amount of damages is unlikely to be sufficient to warrant individuals filing suit on their own behalf. None of the class members will have unique claims, and the defendants' defenses will generally apply to all claims and all members of the class. Even the amount of individual damages will be largely constant.

55. The class action is superior to other available methods of adjudication because there are approximately 3,000 members in the proposed class, and repeated individual litigation of the common issues shared by all class members would be inefficient for all parties and the judicial system.

# V.   FACTS

56.   In 1994, Texas Wesleyan University ("TWU") purchased the law school now located at 1515 Commerce Street, Fort Worth, Texas 76102 ("Law School") and obtained accreditation from the American Bar Association and level VI accreditation from the Southern Association of Colleges and Schools Commission on Colleges ("SACS"), the academic accrediting body.

57.   From 1994 to 2012, approximately 3,000 people received juris doctor degrees from Texas Wesleyan University School of Law, which was owned and operated by TWU until August, 2013.

58.   On December 19, 2012, TWU President Frederick Slabach and former president of Texas A&M University ("TAMU") R. Bowen Loftin notified SACS of TWU's intent to sell the Law School to TAMU.

59.   In a letter dated April 12, 2013, just months before the acquisition of the Law School by TAMU, TAMU informed SACS that if the acquisition was approved, TWUSL would become "Texas A&M University School of Law at Texas Wesleyan University."

60.   On April 15, 2013, TAMU submitted a substantive-change prospectus ("Prospectus") to SACS regarding TAMU's purchase of the Law School.

   1) Page three of the Prospectus states:

   To maintain the current law school status as an ABA approved law school, TWUSL must receive acquiescence for this administrative change by the ABA. TWUSL submitted its formal request on December 5, 2012. A decision by the ABA on TWUSL's request is anticipated in August, 2013 . . . . Because no substantive change in faculty, students, curricula, libraries, IT, finances or facilities will occur in this acquisition, we believe we will qualify for acquiescence from the ABA with a determination that *it is the same law school*. We are committed that no student be caught in a situation where they would not graduate from an ABA-accredited program.

   (Italics added for emphasis.)

   2) Page four of the Prospectus states:

   The merger will also benefit TWUSL, its students, *alumni*, faculty, and staff. The law school will become part of TAMU, which is ranked among the top 20 national public research universities, is a member of the Association of American Universities (AAU), is one of three tier 1 universities in Texas, offers 120 undergraduate and 240 graduate degrees, and has an endowment in excess of $5 billion. Law students and faculty would benefit from the possibilities . . . .

   (Italics added for emphasis.)

61.   The August 12, 2013 letter from the American Bar Association to TWU and TAMU approving the sale of the Law School states in part:

"The proposed acquisition of the Texas Wesleyan University School of Law by Texas A&M University does not amount to the closure of an approved law school and the opening of a different law school within the meaning of Rule of Procedure 20(b)."

62.   Rule 20(a)(4) of the ABA Standards for Approval of Law Schools 2013-2014 states that "[a]cquiring or merging with another university by the parent university where it appears that there may be substantial impact on the operation of the law school" amounts to the closure of an approved law school and the opening of a different law school. If a change of this nature occurs, SACS must give notice to the law school and recommend to the ABA that any acquiescence in the proposed structural change be accompanied by a requirement that the school apply for provisional approval under the provisions of Standard 102 and Rule 4.

63.   On August 2, 2013, Texas Wesleyan University and Texas A&M University entered into an Asset Purchase Agreement ("APA") for the purchase of the Law School.

1) Section 2.1(xv) of the APA shows that TAMU purchased TWU's "Books and Records," a term defined by the APA's section 1.1 to

include alumni records and student files, social media accounts related to the Law School, as well as all goodwill related to the Law School as a going concern.

2) In the APA at section 4.2, TAMU purchased all of the assets necessary for, or material to, the ownership and operation of the Law School. At the least, those assets would include a license to use Plaintiffs' student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

3) Specifically excluded from the APA, and retained by TWU, were all student receivables of the Law School in existence as of the closing date that were attributable to the 2013 Summer semester or any prior semester and all causes of action pertaining to the collection of the student receivables. TWU retained the right to collect on student receivables pursuant to sections 2.1(a)(i) and 2.3 of the APA, but failed to include any other provision in the APA that would protect the rights and privileges of Plaintiffs' degrees.

64.   On August 12, 2013, TWU and TAMU executed a Bill of Sale confirming the terms of the Asset Purchase Agreement.

65.   An addendum to the Prospectus contains TAMU's request for an exemption so TAMU could issue diplomas to current students at the Law School who had not completed the required one-third of credit hours to be considered TAMU graduates. SACS granted TAMU's request. The request contains no request or other discussion of an exemption for the rules for Pre-Acquisition Graduates. A true and correct copy of the addendum is attached as Exhibit A.

66.   On September 12, 2013, the Law School hosted a question and answer session at the Law School in which its representative Dr. Karan Watson stated, "We got a one-time exception for those students who are currently enrolled who will graduate in December that they could have less than one-third of their hours from Texas A&M and still get a degree . . . That's as far as we were able to get the [accrediting body] to bend."[1]

67.   According to a February 2014 article published by FW Weekly, when SACS President Belle Wheelan was asked about the claimed request for a waiver, she reportedly stated that said she did not recall

---

[1] Video of the Q&A session is available in its entirety here:
https://www.youtube.com/watch?v=VMpPtP_PRjo&list=WL&index=7

TAMU asking for any waivers and that diploma reissuance "is not an accreditation issue; that is the university's issue."[2]

68.    In the FW Weekly article, Dr. Wheelan further remarked, "What would have happened once the two institutions merged, then Texas A&M's name would go on that diploma because that was the school that was granting the degree now."

69.    For the Pre-Acquisition Graduates, Dr. Wheelan said that SACS has "no prohibition against putting both [school] names on the diploma. They could do that."

70.    Despite refusing to recognize Pre-Acquisition Graduates as alumni of Texas A&M University School of Law, the Law School continuously uses the accolades of Pre-Acquisition Graduates, including bar-passage rates and employment statistics, in advertisements and publications.[3]

71.    On November 13, 2013, TAMU issued a press release[4] declaring "Texas A&M law students have provided more than 120,000 hours of

[2] The news report is available online at http://www.fwweekly.com/2014/02/26/aggie-vanishing-act/.
[3] Bar-passage rates are viewable in vol. 30, no. 34 of *Texas Lawyer* magazine at http://viewer.zmags.com/publication/318b1ba7#/318b1ba7/25
[4] The statement is available in its entirety on the website for Texas A&M University School of Law: https://law.tamu.edu/media/news-media-resources/story/law-school-awarded-for-smart-moves.

*pro bono* legal services which equates to more than $2.4 million in total legal services given to the community." A true and correct copy of the press release is attached to this Complaint as Exhibit B.

72.    The 120,000 pro bono hours claimed by TAMU includes hours performed by the Pre-Acquisition Graduates.

73.    At least three individuals delayed turning in their pro bono records until after the Law School's acquisition, thereby qualifying for the TAMU School of Law diploma and other benefits. These individuals took no classes after the acquisition of the Law School, but are considered TAMU alumni.

74.    In addition, some senior-level TWU School of Law students had sufficient credits to sit for the bar exam before graduation. In doing so, the state bar recognized other TWU School of Law near-graduates who were taking the bar exam at the same time, yet only the latter group were allowed to obtain the TAMU School of Law diploma.

75.    Some May 2013 graduates are inexplicably listed on the Texas Bar as graduated from TAMU School of Law; such use could be found to be a trademark infringement.

76.   A page of TAMU School of Law's website titled "Careers and the Aggie Network" features the employment statistics for the class of 2012, prior to the acquisition. A true and correct copy of the webpage is attached to this Complaint as Exhibit C.

77.   In Vol. 1, Issue 1 of *The Aggie Lawyer*, the inaugural alumni magazine published by Texas A&M University School of Law, pages 25 to 33 boast the accomplishments of graduates ranging from 1993 to 2013, including Plaintiff Brown (p.33). A true and correct copy of an excerpt of the magazine is attached to this Complaint as Exhibit D.[5]

78.   Also displayed in the above-mentioned magazine at page 24 is an announcement regarding the yearly trip to be admitted to the United States Supreme Court that the Office of Marketing & External Affairs offers to graduates who have been licensed for at least three years. According to the Law School's public position, TAMU School of Law has zero graduates who have been licensed for at least three years. This offer is routinely advertised to Pre-Acquisition Graduates by email. A true and correct of an excerpt of the magazine is attached to this Complaint as Exhibit E.

---

[5] http://issuu.com/tamu_law/docs/aggie_lawyer_vol-1_issue-1_online_s?e=13332889/9159537

79.   In its 2014 Standard 509 Information Report, TAMU School of Law states that it has been ABA-approved since 1994.

80.   TAMU School of Law disallows unsanctioned use of its marks, listing Collegiate Licensing Company as a licensing agent, and refers to TAMU's general rules at trademarks.tamu.edu.

81.   TAMU School of Law provides strict instructions on the use of its marks at http://tamulawtest.ddns.net/docs/default-source/faculty-documents/tamulaw_brand_guidelines.pdf?sfvrsn=2.

82.   TAMU and its subsidiaries own many trademarks, including the text mark "Texas A&M University" (Reg. No. 2273374) and the graphical seal (Reg. No. 1962785) which are found on every diploma issued by a TAMU subsidiary.

83.   Pre-Acquisition Graduates have requested reissued degrees from TAMU School of Law, but have been told that the Law School will not reissue degrees with the new name that is on the front of its building, on its newly remodeled web site, and on all other public documents.

84.   In response to the renamed TAMU School of Law's refusal to reissue diplomas to Pre-Acquisition Graduates, a group of more than

500 Texas Wesleyan University School of Law alumni signed a petition ("Petition") asking that Texas A&M University School of Law reconsider its 2013 decision not to reissue corrected diplomas to its alumni who graduated prior to the purchase.

85.   The Petition was delivered to the Law School, Texas A&M University Interim President Mark Hussey, Board of Regents, American Bar Association, Texas State Bar, and Texas Legislature on behalf of the Petition's signers.

86.   Concurrent with the Petition, a dozen Pre-Acquisition Graduates put together a complaint to the American Bar Association ("ABA Complaint"). The ABA Complaint cites troublesome issues that Pre-Acquisition Graduates have faced as a result of TAMU's refusal to grant earlier requests for corrected degrees, including reciprocity delays and the reality that Texas Wesleyan University School of Law is not listed on the drop-down menus found in many Internet forms used for the automation of legal processes. Examples include the following:

1) The Law School has removed its pre-acquisition name from use with the Law School Admission Council, so that a Pre-Acquisition Graduate has no ability to choose "Texas Wesleyan School of Law"

from the drop-down menu when registering for LLM programs. The Law School Admission Council uses a drop-down menu for those beginning the process to enroll in an LLM program which does not include TWU School of Law as an option. A true and correct copy of a screen print of that drop-down menu is attached to this Complaint as Exhibit F.

2) The American Bar Association uses a drop-down menu in its Employment Summary Report webpage which no longer contains an option to choose TWU School of Law, but has an option to choose TAMU School of Law's employment records dating back to 2010, three years prior to the purchase. A true and correct screen print of this site showing that TWU School of Law is not available and that the option for TAMU School of Law is available is attached as Exhibit G.[6] The pre-acquisition reports provide employment records of those who graduated originally with TWU School of Law degrees.

87.    In July, 2014, Plaintiffs gave notice to the ABA that, in light of Rule 20(a)(4) of the ABA Standards for Approval of Law Schools 2013-

---

[6] This view of the ABA's webpage can be replicated at http://employmentsummary.abaquestionnaire.org/.

2014, TAMU's acquisition of the Law School created a substantial, rather than a mere administrative, impact on the operation of the Law School by filing a complaint with the ABA describing TAMU's refusal to recognize the alumni status of Pre-Acquisition Graduates by reissuing diplomas ("ABA Complaint"). A true and correct copy of the ABA Complaint is attached to this Complaint as Exhibit H.

88.   The American Bar Association issued a response to Plaintiffs' ABA Complaint, stating it did not act regarding student-school disputes, but was limited to the approval of law schools.

89.   Plaintiffs have attempted to resolve this issue amicably by discussion with TAMU School of Law personnel, petitioning TAMU School of Law, the Board of Regents, and the American Bar Association.

90.   Plaintiffs continuously receive emails from TAMU as though they were alumni of TAMU Law. Plaintiffs have received emails from the TAMU Association of Former Students and TAMU School of Law asking Plaintiffs to add their names to the directory of former students. Plaintiffs have received emails from the Office of Gift Planning soliciting donations from Plaintiffs.

91.   Plaintiff Brown's current profile on the Texas Bar's website reports that her law school was "Texas Wesleyan University," a law school that appears to be no longer accredited. However, the Law School did not lose its accreditation or cease to exist. In fact, the SACS 2013 Roll of Accredited and Candidate Institutions states that 2013 is the initial accreditation date of TAMU's level VI accreditation. The Roll additionally states that TAMU's level VI accreditation was gained from a separate accredited institution, and that prior to 2013, the institution was listed as a different entity.

92.   Plaintiffs believed that they would be able to obtain after-hours library cards for use at the Law School, but that promise continues to be unfulfilled, nearly two years after the acquisition. To create their own cards, Plaintiffs would have to violate Defendant TAMU School of Law's marks.

93.   Plaintiffs also reasonably believed, based on industry practices of higher education, that the Law School would maintain records of its graduates so that potential employers and clients can locate and verify that they attended a law school that has not failed, and that TAMU

School of Law would continue to honor the special relationship that educational institutions have with their graduates.

94.    Based on the statements made during the Q&A Session, Plaintiffs have no assurance that, as soon as the Standard 509 reports, salary reports, and other public documents no longer require reference to the records of the Pre-Acquisition Graduates, TAMU School of Law will simply drop all support to the Pre-Acquisition Graduates.

95.    TAMU School of Law's failure to continue servicing its graduates has other real impact, as individuals have worked with lenders to refinance their law school loans, only to find out the lender could not find TWU School of Law on the accredited list, and therefore could not go further with that lender and would have to start over with another.

96.    Pre-Acquisition Graduates also suffer from the inability to show potential employers that their law school still exists. For example, in one faculty recruiting service, users can select TWU School of Law from the drop-down menu of law schools, but then the potential employer is given the information without a means of explaining that the school still exists and that it has merely been acquired and renamed.

97.    At the time that Plaintiffs accepted TWU's offer of enrollment and began paying tuition, Plaintiffs reasonably expected that the law degrees they were to receive from TWU would come with all of the rights and privileges as any other ABA-accredited degree. These rights and privileges include the ability to reference the degree-granting institution on applications for reciprocal admission to other state bars and to list an ABA-accredited institution on Plaintiffs' resumes, and the reasonable expectation that TWU would take measures to ensure that its graduates could easily validate their degree within the legal community without an extensive discussion about the matter every time the issue arises.

98.    Plaintiffs seeking admission on motion to the bars of other states are unable to obtain the required certification from an existing law school. For example, the Arkansas State Board of Law Examiners requires that applicants requesting admission by motion to complete a form which must be signed by the ABA-accredited law school from which the applicant received his or her degree. Similarly, the Oklahoma Board of Bar Examiners requires applicants seeking admission by

motion to obtain an official transcript from the same ABA-accredited institution which issued the applicant's J.D.

99.    Plaintiffs can surmount these issues, but the task is made more complicated and taken out of the mechanistic approval process which Plaintiffs enjoyed prior to the acquisition.

100. Additionally, Plaintiffs' local job prospects are at risk, as employers often require documentation of graduation from an accredited law school. When applying for legal jobs, Plaintiffs now find themselves being called to defend their alma mater's admissions standards, as Plaintiffs are unable to list an ABA-accredited school on their resumes and are prohibited from listing Texas A&M University School of Law.

## VI.   CLAIM 1 – DECLARATORY JUDGMENT
## (NON-INFRINGEMENT AND LICENSE OF TRADEMARK)

101. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

102. Plaintiffs file this action for a declaration of rights with respect to federal trademark laws, over which the court is given jurisdiction by 28 U.S.C. §§ 1331 and 1338 (trademark federal question), and 28 U.S.C. § 2201 (declaratory judgment).

103. Plaintiffs seek the Court's declaration that the Law School treat Pre-Acquisition Graduates just as it does post-acquisition graduates, particularly with regard to the Law School's marks and duties of the Law School with respect to all its graduates.

104. The dispute is an actual controversy ripe for adjudication based on the "totality of the circumstances" standard:

    a. Plaintiffs are using the registered mark in commerce in various third-party publications to describe their education and in advertising, such as LinkedIn, Facebook, and the State Bar of Texas.

b. Plaintiffs have also requested reissued diplomas with the Law School's new name, and those requests have been denied.

c. TAMU School of Law hosted a question-and-answer session directed at the Pre-Acquisition Graduates on September 12, 2013, ("Q&A Session") in which Dr. Karen Watson described the Law School's position to be "unbendable," while stating that the Pre-Acquisition Graduates would not be considered alumni of TAMU School of Law, and Pre-Acquisition Graduates would not be able to obtain reissued diplomas or be called graduates of TAMU School of Law.

d. TAMU School of Law requires permission to use its marks, publishing a brand guide on its web site at: http://tamulawtest.ddns.net/docs/default-source/faculty-documents/tamulaw_brand_guidelines.pdf?sfvrsn=2.  disallows unsanctioned use of its marks, giving Collegiate Licensing Company as a licensing agent, and refers to the general rules of TAMU's rules at trademarks.tamu.edu.

e. TAMU School of Law uses the trademarks of Texas A&M University, including the text mark "Texas A&M University"

(Reg. No. 2273374) and the graphical seal (Reg. No. 1962785) which are found on every diploma issued by TAMU School of Law.

f.  After its acquisition, the Law School replaced signage on the front of the Law School, remodeled its web site, and removed its former name from many other third-party listings with professional impact, such as the Law School Admission Council and American Bar Association sites, so that Pre-Acquisition Graduates can no longer find the name of an accredited law school from which they received their degree.

g.  While TAMU School of Law denies that the Pre-Acquisition Graduates are its alumni, TAMU School of Law presents the salary of those same graduates in its Standard 509 reports with the American Bar Association under its own name, while the previously available records for Texas Wesleyan University School of Law are mysteriously no longer shown. See Ex. G (screenprint of http://abarequireddisclosures.org/ showing menu) and Ex. I (TAMU School of Law 2014 Standard 509 Information Report).

h. TAMU has filed suits to protect its trademarks, and Plaintiffs reasonably believe that if Plaintiffs ordered or created their own diplomas without sanction from the Law School, they would face suit for trademark or copyright infringement.

i. In addition to action by TAMU School of Law, any attempt to create or order an appropriate replacement degree would likely result in action by the Texas Attorney General's office, which regularly acts against what it deems to be illegal diplomas swift and aggressively. *See, e.g., State v. Lincoln Academy*, No. 2014-14329 (295th Dist. Ct., Harris County, Tex. Aug. 4, 2014).

j. The Law School has removed its pre-acquisition name from use with the Law School Admission Council, so that a Pre-Acquisition Graduate has no ability to choose "Texas Wesleyan School of Law" from the drop-down menu when registering for LLM programs. The current menu now appears so:



k. As another example, in matriculating to the Law School initially, Plaintiffs reasonably believed that if they earned their juris doctor degrees, they would be licensed by the Law School and able to fill out mundane forms like the one above in the ordinary

manner as all other graduates of all other Texas law schools do, and as Plaintiffs did until the Law School's acquisition by TAMU.

l.   Plaintiffs believed that they would be able to obtain an after-hours library card for use at the Law School, but that promise continues to be unfulfilled, nearly two years after the acquisition. To create their own library cards, Plaintiffs would have to violate Defendant TAMU School of Law's marks.

m.  In the Asset Purchase Agreement ("APA") at section 2.1(xv), TAMU purchased TWU's "Books and Records," a term defined by the APA's section 1.1 to include alumni records and student files, social media accounts relate to the Law School, as well as all goodwill related to the Law School as a going concern.

n.   In the APA at section 4.2, TAMU purchased all of the assets necessary for, or material to the ownership and operation of the Law School. At the least, those assets would include a license to use Plaintiffs' student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

o. Plaintiffs also reasonably believed, based on industry practices of higher education, that the Law School would maintain records of its graduates so that potential employers and clients can locate and verify that they attended a law school that has not failed, and that TAMU School of Law would continue to honor the special relationship that educational institutions have with their graduates.

p. Based on the statements made during the Q&A Session, Plaintiffs have no assurance that, as soon as the Standard 509 reports, salary reports, and other public documents no longer require reference to the records of the Pre-Acquisition Graduates, TAMU School of Law will not simply drop *all* support of the Pre-Acquisition Graduates.

105. Plaintiffs contend that the Law School has an obligation to honor an uphold the traditional duties of an educational institution with respect to the Pre-Acquisition Graduates based on the following:

a. TWU School of Law did not lose its accreditation or cease to exist; the American Bar Association list of accredited schools lists TAMU School of Law with an accreditation date of 1994, and all

acquisition documentation states specifically that TAMU School of Law is a mere acquisition of a law school as an ongoing concern and renaming, and *not* the closing of TWU School of Law with a new TAMU School of Law built with the previous school's assets.

b. TAMU School of Law was not listed as an accredited law school until 2013, and then suddenly appears with the accreditation date of 1994; TWU School of Law was listed as an accredited law school until TAMU School of Law was listed. If TAMU School of Law was retroactively recognized as accredited in 1994, then all of the Pre-Acquisition Graduates must be recognized as after-the-fact graduates of TAMU School of Law.

c. In page three of the Prospectus provided to the Southern Association of Colleges and Schools (the academic accrediting body) during the approval process, TAMU states (underlining added):

> To maintain the current law school status as an ABA approved law school, TWUSL must receive acquiescence for this administrative change by the ABA. TWUSL submitted its formal request on December 5, 2012. A decision by the ABA on TWUSL's request is anticipated in August, 2013 (see paragraph above). Because no substantive change in faculty, students, curricula, libraries, IT, finances or facilities will occur in this acquisition, we believe we will qualify for acquiescence from the ABA with a determination that <u>it is the same law school.</u> We are committed that no student be caught in a situation where they would not graduate from an ABA-accredited program.

d.  Page four of the Prospectus states:

> The merger will also benefit TWUSL, its students, alumni, faculty, and staff.  The law school will become a part of TAMU, which is ranked among the top 20 national public research universities, is a member of the Association of American Universities (AAU), is one of three tier 1 universities in Texas, offers 120 undergraduate and 240 graduate degrees, and has an endowment in excess of $5 billion.  Law students and faculty would benefit from the possibilities

e.  In a letter to SACS dated April 12, 2013, just months before the

acquisition, Defendants stated:

> If approved, TWUSL would become "Texas A&M University School of Law at Texas Weslayan University."

(A true and correct copy of the letter is attached as Ex. J.)

f.  On December 19, 2012, President of Texas A&M University Dr.

Bowen Loftin sent a letter to SACS President Dr. Belle Wheelan,

stating (underlining added):

> This letter is one of two that together constitute joint notification to inform you of the intent of Texas A&M University to acquire the Texas Wesleyan University School of Law (Address: 1515 Commerce St., Fort Worth, TX 76102). Under the proposed agreement, the school would be known as the Texas A&M University School of Law at Texas Weslayan University. Under the agreement, Texas A&M would acquire ownership and operational control of the law school. A virtually identical letter from Texas Weslayan University is coming to you under separate cover.

(A true and correct copy of this letter is attached as Ex. K.)

g.  The American Bar Association also approved the acquisition,

stating:

> (3)   The proposed acquisition of the Texas Wesleyan University School of Law by Texas A&M University does not amount to the closure of an approved law school and the opening of a different law school within the meaning of Rule of Procedure 20(b).

h. On September 24, 2013, TAMU agent Pam Matthews received an email from Cheryl Cardell, a vice-president of the Southern Association of Colleges and Schools, which was later procured through a freedom-of-information request, and follows:

> Since the acquisition of the law school by Tx A & M University is not retroactive, degrees earned at the law school before that time are Texas Wesleyan University degrees and should remainTexas Wesleyan University degrees.

There is no explanation or background for the email, which was sent shortly after the Q&A Session in which TAMU School of Law agents informed the Pre-Acquisition Graduates that TAMU was not legally able to issue degrees. However, the relevant reasoning is that Ms. Cardell is stating that TWU degrees should remain TWU degrees because the acquisition is not retroactive. Plaintiffs would point to the 1994 accreditation date claimed by TAMU School of Law and assert otherwise.

i. In the Disclosure Schedules to the APA, TAMU assumes more than thirty pages of listed executory contracts, indicating that

TAMU purchased an ongoing concern, rather than just buying assets of a defunct business.

j. TAMU School of Law has touted that the Law School's alumni have performed 120,000 pro bono hours. This number must include the thirty hours that each Pre-Acquisition Graduate has performed, or the calculation would fall short.

k. TAMU School of Law's failure to continue servicing its graduates has other real impact, as individuals have worked with lenders to refinance their law school loans, only to find out the lender could not find TWU School of Law on the accredited list, and therefore could not go further with that lender and would have to start over with another.

l. Pre-Acquisition Graduates also suffer from the inability to show potential employers that their law school still exists. For example, in one faculty-recruiting service, users can select TWU School of Law from the drop-down menu of law schools, but then the potential employer is given the information without a means of explaining that the school still exists.

m. Plaintiffs have attempted to work with TAMU School of Law, providing it with a petition containing more than 500 names, asking for resolution of the matter without resorting to the courts.

n. Plaintiffs also sought administrative resolution with the American Bar Association to ensure that all avenues of resolution were attempted.

106. Plaintiffs assert that TAMU School of Law must be run in accordance with TAMU's statements to SACS, and therefore must admit that pre- and post-acquisition graduates of the Law School should have the same marketing position, and use the most recent name and obtain new diplomas which use the Law School's TAMU marks in the same way that graduates used the Law School's TWU marks before the acquisition.

107. Plaintiffs ask the Court to declare that TAMU School of Law cannot claim the work and accomplishments of Plaintiffs, and then deny that they are graduates. Plaintiffs ask the Court to issue a declaration that puts explicit terms to the special relationship and duties between educational institution and its graduates, or at the least, require TAMU

School of Law to treat all of its graduates from the accreditation date of 1994 to present with the same ability to obtain diplomas or any other benefit of graduation, including, but not limited to, the use of TAMU School of Law's name when filling out various third-party forms found in a typical legal career.

## VII.    CLAIM 2 – 42 U.S.C. § 1983
## (CIVIL ACTION FOR DEPRIVATION OF RIGHTS)

108. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

109. This is an action brought by Plaintiffs seeking declaratory relief, compensatory damages, and punitive damages against the named Defendants for violations of rights guaranteed under the laws of the United States and for personal and other injuries in violation of laws of the State of Texas.

110. Additional Jurisdiction and Venue - This action is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment, and 28 U.S.C. §§ 1331 and 1343(a).

111. Plaintiffs bring this action for the unequal and irrational treatment of Pre-Acquisition Graduates in comparison to those who have graduated since TAMU acquired the Law School.

112. The TWU School of Law operated as part of TWU from 1994 to May 2013, at which time the Law School was acquired by TAMU and then renamed "TAMU School of Law."

113. All graduates of TAMU School of Law are required to perform thirty hours of pro-bono service to the community before qualifying to graduate.

114. At least three individuals delayed turning in their pro bono records until after the Law School's acquisition, thereby qualifying for the TAMU School of Law diploma and other benefits. These individuals took no classes after the acquisition of the Law School, but are considered TAMU School of Law alumni.

115. In addition, some senior-level TWU School of Law students had almost enough credits to graduate that they could sit for the bar exam before graduation. In doing so, the state bar recognized other TWU School of Law near-graduates who were also taking the bar exam at the

same time, yet only the latter group were allowed to obtain the TAMU School diploma.

116. In yet other conditions, some May 2013 graduates were inexplicably listed on the Texas Bar as graduated from TAMU School of Law; such use could be found to be infringement.

117. As noted *supra*, the Law School was purchased as an ongoing concern, rather than a failure of one law school and the creation of a new one using the old school's assets.

118. TAMU School of Law touts 120,000 pro bono hours of generosity provided by the Law School's alumni to the local community, a number that requires the use of the Pre-Acquisition Graduates' pro bono hours.

119. TAMU School of Law is listed as having achieved its accreditation in 1994, begging the question of where the list of the graduates from 1994 to 2013 is located.

120. The Fourteenth Amendment prevents the unequal treatment of individuals similarly situated by state actors, even if there was only one individual being mistreated. *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

121.  Plaintiffs contend that based on Defendants' own behavior, there is no rational basis for the Law School to differentiate between pre- and post-acquisition graduates. Plaintiffs ask the Court to require Defendants to treat all of its graduates equally.

122.  Plaintiffs also seek an award of actual damages and attorney fees in an amount deemed appropriate by this Court pursuant to 42 U.S.C. §§ 1983-1988.

## VIII.   CLAIM 3 - BREACH OF IMPLIED CONTRACT

123.  Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

124.  This is a claim for breach of implied-in-fact contract under the Texas common law.

125.  TWU breached the implied-in-fact contract between Plaintiffs and TWU when TWU failed to take necessary actions to protect the credibility of law degrees previously issued to Plaintiffs.

126. *Elements of the claim.* A party is entitled to relief based on breach of contract when:

   A. there exists a contractual relationship between the parties,

   B. the contract supports plaintiff's right to recover,

   C. the contract is supported by consideration,

   D. plaintiff performed or tendered performance under the contract,

   E. defendant breached the contract, and

   F. plaintiff was damaged as a result of defendant's breach.

## A.    *A contract exists between Plaintiffs and TWU.*

127. Texas courts have said that the relationship between a private school and its student has by definition primarily a contractual basis. *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1999).

128. Where a private university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition, a contract exists. *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1999); *see Smith v. Renz*, 840 S.W.2d

702, 704 (Tex. App.—Corpus Christi 1992, writ denied) (stating an implied contract arises from the dealings of the parties, from which the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement thereto).

129. An implied-contract relationship between a university and its students is supported by federal courts nationwide. *Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 649-50 (Ct. App. 2007) (holding that an implied contract was created by the students' conduct when they accepted the University's offer of enrollment). *See, e.g., Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992); *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977) (terms of contract between student and college may include statements provided in student manuals and registration materials); *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998) (standard for interpreting contractual terms is that of "*reasonable expectation*—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it") (emphasis added); *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D.Conn 2000) ("Because a student bases his or her decision to attend a college or university, in significant part, on the

documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises … appears sound").

130. TWU offered legal education to Plaintiffs for the purpose of obtaining ABA-recognized juris doctor degrees. Plaintiffs based their decision to attend TWU on TWU's fact books, student handbook, catalog, and other publications containing statements of the Law School's accreditation by the American Bar Association.

131. A meeting of the minds of parties to an implied contract is inferred from and evidenced by their conduct and course of dealing. *Haws & Garrett Gen. Contrs., Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607, 609 (Tex. 1972).

132. Following their acceptance of TWU's offer of enrollment, Plaintiffs had a reasonable expectation that TWU would preserve the integrity of the juris doctor degrees TWU issued to Plaintiffs.

133. TWU's conduct indicated that the juris doctor degrees it issued would remain credible and recognized by third parties for as long as the Law School remained in existence. Plaintiffs acted so as to complete

course requirements and remain in good academic standing, and TWU issue juris doctor degrees to Plaintiffs upon completion of the requirements.

134. Over the years prior to the acquisition by TAMU, it was never once contemplated by the parties that the degrees granted by TWU to Plaintiffs would lose their value upon acquisition by another school.

## B.  *The terms of the contract support Plaintiffs' right to recover.*

135. The specific terms of an implied contract must logically be defined by the college or university's policies and requirements. *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1999).

136. TWU's policies contained many statements that its graduates would receive juris doctor degrees from an ABA-accredited school.

137. Plaintiffs predicated their decisions to attend the Law School on TWU's implied promise that, as an ABA-accredited institution, TWU would confer degrees that would continue to be valid in the future and that would hold rights and privileges comparable to any other degree granted by an ABA-accredited institution.

138.  Upon admission to the Law School, Plaintiffs had the reasonable expectation that the degrees they were to receive from TWU School of Law would remain valid for admission by motion to other state bars and for use in job applications without undue explanation. TWU has failed to take reasonable measures to meet that expectation.

139.  Currently, Plaintiffs applying for reciprocal admission to the bars of other states are often unable to select TWU School of Law as their alma mater, and Plaintiffs have been told that they are not alumni of TAMU School of Law, even though TAMU School of Law touts Plaintiffs' accomplishments as its own.

140.  Even the American Bar Association's website does not list TWU School of Law in its drop-down menu on its webpage titled "Section of Legal Education – Employment Summary Report."[7]

141.  State courts have held that custom and usage can also create specific terms by implication. *Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 649-50 (Ct. App. 2007).

142.  The practices of other American universities that have undergone name changes or have been acquired by other institutions indicate that

[7] Webpage is viewable at http://employmentsummary.abaquestionnaire.org/

industry custom is to preserve the quality and credibility of degrees issued from the former institution. Often this is done simply by reissuing diplomas to reflect the change. Upon its transition from Mesa State College to Colorado Mesa University, the school granted its graduates new diplomas reflecting the new name of the institution. Formerly International College, Hodges University allowed graduates of International College to, for a small fee, obtain diplomas granted by Hodges University. When TAMU acquired East Texas State University, it allowed pre-acquisition graduates to purchase diplomas reflecting the new name for a nominal fee.

## C.    *The contract is supported by consideration.*

143. Plaintiffs paid tuition to TWU and completed all course requirements. TWU promised to issue ABA-accredited law degrees to Plaintiffs.

144. Over the twenty years prior to the acquisition by TAMU, it was never once contemplated by the parties that the degrees granted by TWU to Plaintiffs would lose their value upon acquisition by another school or by any other substantive change in the Law School.

145. At the time that Plaintiffs accepted TWU School of Law's offer of enrollment and began paying tuition, Plaintiffs reasonably expected that the law degrees they were to receive from TWU School of Law would come with all of the rights and privileges as any other ABA-accredited degree. These rights and privileges include the ability to reference the degree-granting institution on applications for reciprocal admission to other state bars and to list an ABA-accredited institution on Plaintiffs' resumes without a need to explain incongruities in Plaintiffs' academic records.

146. The rights and privileges associated with the degrees conferred by TWU School of Law at the time of Plaintiffs acceptance were the basis of the bargain between TWU and Plaintiffs.

**D.    *Plaintiffs fully performed under the contract.***

147. Plaintiffs paid tuition to TWU and completed all Law School and ABA requirements for receiving juris doctor degrees.

**E.    *TWU breached the contract.***

148. In failing to take actions to protect the credibility of Plaintiffs' degrees, TWU breached its implied contract with Plaintiffs.

149.  The industry practice to preserve the credibility of issued degrees and the conduct of TWU, President Slabach, and Plaintiffs created an implied contract between and Plaintiffs and TWU that TWU would act to protect the credibility of Plaintiffs' degrees received from TWU School of Law in exchange for Plaintiffs' payment of tuition and completion of course requirements.

150.  TWU and President Slabach failed to comply with the terms of its implied contract with Plaintiffs when TWU and President Slabach failed to include terms in the APA to ensure that the credibility of Plaintiffs' degrees would continue following the acquisition of the Law School by TAMU, or to otherwise meet Plaintiffs' reasonable expectations of being able to have their degrees validated by TAMU School of Law.

### F.      Plaintiffs were damaged as a result of Defendants' breach.

151.  Defendants enjoy the benefits of their transaction with Plaintiffs, but Plaintiffs no longer enjoy the benefit of affiliation with an ABA-accredited law school. Defendants received tuition money from Plaintiffs. Defendants continue to use Plaintiffs' bar-passage rates in statistics published by TAMU School of Law, and Defendants advertise

the accolades of Pre-Acquisition Graduates in myriad press releases, advertising, website postings, and even marketing efforts to convince Pre-Acquisition Graduates to put TAMU in their wills.

152.  Plaintiffs seeking admission on motion to the bars of other states are unable to obtain the required certification from an existing law school without undue complication. For example, the Arkansas State Board of Law Examiners requires that applicants requesting admission by motion complete a form which must be signed by the ABA-accredited law school from which the applicant received his or her degree, and the Oklahoma Board of Bar Examiners requires applicants seeking admission by motion to obtain an official transcript from the ABA-accredited institution from which the applicant received her J.D.

153. Without an existing, ABA-accredited alma mater to maintain student records and grant certifications, Plaintiffs are barred from practicing law in other states through admission by motion without undue complexity that they did not experience prior to the purchase.

154. Additionally, Plaintiffs' local job prospects are at risk, as employers often require documentation of graduation from an accredited law school. When applying for legal jobs, Plaintiffs now find

themselves being called to defend their alma mater's admissions standards, as Plaintiffs are unable to list an ABA-accredited school on their resumes and are prohibited from listing TAMU School of Law.

### G.   *Plaintiffs are entitled to equitable relief.*

155.  To obtain the equitable remedy of specific performance, a plaintiff must plead and prove that he was ready, willing, and able to timely perform his obligations under contract. *Di Giuseppe v. Lawler*, 269 S.W.3d 588, 593 (Tex. 2008).

156. As stated above, Plaintiffs have fully performed under the contract.

157.  Plaintiffs seek an order from this Court that TWU amend its sale documents so that Pre-Acquisition Graduates are properly supported by TAMU School of Law, reissue diplomas, and require TAMU School of Law to treat the Pre-Acquisition Graduates as their alma mater, in exactly the same way as their post-acquisition graduates.

158.  *Conditions Precedent.* All conditions precedent to Plaintiffs' claim for relief have been performed or have occurred.

*159. Attorney Fees.* Plaintiffs retained counsel, who presented Plaintiffs' claim to Defendants. Plaintiffs are entitled to recover reasonable and necessary attorney fees in accordance with sections 38.001(8) and 38.005 of the Texas Civil Practice and Remedies Code.

160.  Section 38.001(8) has been interpreted to include contracts that are implied in fact. *Bd. of Cnty. Comm'rs v. Amarillo Hosp. Dist.*, 835 S.W.2d 115, 125-26 (Tex. App.—Amarillo 1992).

161.  Plaintiffs presented their claim to Defendants, but Defendants did not reissue diplomas within thirty days after the claim was presented. Therefore, Plaintiffs are entitled to recover reasonable attorney fees pursuant to section 38.001(8) for breach of contract.

## IX.   *ALTERNATIVE* CLAIM - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

162.  Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

163.  This Court has recognized that an informal fiduciary relationship may arise between a private university and a student where the student trusts in and relies upon the university. This Court recognizes a cause

of action for breach of good faith and fair dealing in an informal fiduciary relationship under the Texas common law. *Colli v. S. Methodist Univ.*, No. 3:08-CV-1627-P, 2011 U.S. Dist. LEXIS 92073, at *6-8 (N.D. Tex. Feb. 14, 2011); *see Bank One, N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998).

## A. *The parties have an informal fiduciary relationship.*

164. Some contracts involve special relationships that may give rise to duties enforceable as torts. *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston [1st Dist.] 1996). To impose a tort duty upon parties to a contract, the court must first find that a special relationship exists between them. When special confidence is placed in one who thereby obtains a resulting superiority of position and influence, a fiduciary or confidential relationship may result. The existence of a special duty in the context of a contract is not inconsistent. The special relationship may arise from the element of trust necessary to accomplish the goals of the contract, or because of an imbalance of bargaining power. *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston [1st Dist.] 1996).

165.  In accepting TWU School of Law's offer of enrollment to the law school, Plaintiffs placed special confidence in TWU. Plaintiffs trusted TWU to accomplish the goal of the parties' implied contract that Plaintiffs' degrees would carry the same rights and privileges in the future as they did when conferred.

166.  An informal fiduciary duty creates a common-law duty of good faith and fair dealing from which tort damages result. *Bank One, N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998).

## B.  *Defendants breached their duty.*

167.  Plaintiffs do not have to show proof of actual causation or economic damage, only that TWU breached its standard of care. *Campbell v. Brummett*, No. 14-99-00750-CV, 2000 Tex. App. LEXIS 7991, at *4, 5 (Tex. App.--Houston [14th Dist.] Nov. 30, 2000, no pet.).

168.  TWU and President Slabach owed a duty of reasonable care to the Pre-Acquisition Graduates to ensure that their juris doctor degrees issued by TWU prior to the acquisition by TAMU would retain their value and integrity following the acquisition.

169.  Section 2.1(xv) of the Asset Purchase Agreement shows that TWU conferred all alumni and student records to TAMU. Section 4.2 of the APA shows that TAMU purchased all of the assets necessary for, or material to, the ownership and operation of the Law School. At the least, those assets would include a license to use Plaintiffs' student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

170.  TWU and President Slabach breached the duty to deal fairly with Plaintiffs when TWU and President Slabach did not act to protect the credibility of Plaintiffs' degrees.

171. A person acting in good faith and dealing fairly would have ensured that TAMU accepted a duty to validate the degrees of Pre-Acquisition Graduates or provide replacement diplomas. This easily could have been effected by including an additional provision in the Asset Purchase Agreement.

172.  The practices of other American universities that have undergone name changes or have been acquired by other institutions indicate that industry custom is to preserve the quality and credibility of degrees issued from the former institution. Often this is done simply by

reissuing diplomas to reflect the change. Upon its transition from Mesa State College to Colorado Mesa University, the school granted its graduates new diplomas reflecting the new name of the institution. Formerly International College, Hodges University allowed graduates of International College to, for a small fee, obtain diplomas granted by Hodges University.

173. When TAMU acquired East Texas State University, it allowed pre-acquisition graduates to purchase diplomas reflecting the new name for a nominal fee.

174. TWU failed to deal fairly when it did not include terms in the APA to ensure that the credibility of Plaintiffs' degrees would continue following the acquisition of the Law School by TAMU, or to otherwise meet Plaintiffs' reasonable expectations of being able to have their degrees validated by TAMU School of Law.

### C.   *Plaintiffs are entitled to relief.*

175. Under a claim for breach of the duty of good faith and fair dealing, Plaintiffs are entitled to damages in tort. *Bank One, N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998).

176.  Plaintiffs seek equitable relief, asking the Court to grant an order requiring the reissuance of diplomas, which shall reflect the acquisition of the Law School by TAMU.


## X.   *ALTERNATIVE* CLAIM – NEGLIGENCE

177.  Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.  This is a claim for negligence under the Texas common law.

179.  TWU and President Frederick G. Slabach breached their duty of care to Plaintiffs when TWU and President Slabach failed to take necessary actions to protect the credibility of law degrees issued to Pre-Acquisition Graduates.

180.  *Elements of the claim*. A party is entitled to relief based on negligence when one party owes a duty to another and breaches that duty, resulting in damages proximately caused by the breach.

## A.    TWU and President Slabach owed a duty to Plaintiffs.

181.  TWU and President Slabach owed a duty of reasonable care to the Pre-Acquisition Graduates to ensure that the juris doctor degrees issued by TWU School of Law prior to the acquisition by TAMU would retain their value and integrity following the acquisition.

182.  Section 2.1(xv) of the Asset Purchase Agreement shows that TWU conferred all alumni and student records to TAMU. Section 4.2 of the APA shows that TAMU purchased all of the assets necessary for, or material to, the ownership and operation of the Law School. At the least, those assets would include a license to use Plaintiffs' student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

183.  A person of reasonable care would have ensured that TAMU accepted a duty to validate the degrees of Pre-Acquisition Graduates or provide replacement diplomas. This easily could have been effected by including an additional provision in the Asset Purchase Agreement.

184.  Furthermore, the practices of other American universities that have undergone name changes or have been acquired by other institutions indicate that industry custom is to preserve the quality and

credibility of degrees issued from the former institution. Often this is done simply by reissuing diplomas to reflect the change. Upon its transition from Mesa State College to Colorado Mesa University, the school granted its graduates new diplomas reflecting the new name of the institution. Formerly International College, Hodges University allowed graduates of International College to, for a small fee, obtain diplomas granted by Hodges University. When TAMU acquired East Texas State University, it allowed pre-acquisition graduates to purchase diplomas reflecting the new name for a nominal fee.

## B.    *TWU and President Slabach breached the duty.*

185.  TWU and President Slabach failed to exercise reasonable care to ensure that the credibility of the Pre-Acquisition Graduates' degrees would continue following the acquisition of the law school by TAMU.

186.  The Asset Purchase Agreement contains provisions allowing TWU to collect on student receivables prior to the acquisition, but includes no other provisions that would protect the rights and privileges of Plaintiffs' degrees.

187.  TWU failed to include a provision in the APA specifically imposing a duty on TAMU to validate the degrees of Pre-Acquisition Graduates for as long as the Law School remains operational.

188.  In failing to take reasonable measures to ensure that Plaintiffs' degrees would retain their credibility following the acquisition, TWU and President Slabach breached their duty to Plaintiffs.

## C.  Defendants' breach caused damage to Plaintiffs.

189.  TWU and President Slabach's breach actually and proximately caused damage to Plaintiffs. But for TWU and President Slabach's failure to take reasonable steps to ensure the integrity and rights of Plaintiffs' juris doctor degrees issued by TWU, Plaintiffs' admissions to other state bars and applications to LLM programs through LSAC would not be jeopardized. Plaintiffs would still be able to access their student records and receive validation of their degrees from TAMU School of Law.

190.  It was reasonably foreseeable at the time of the acquisition that failing to write provisions into the Asset Purchase Agreement specifically pertaining to alumni of the Law School and degrees previously issued by the Law School might reasonably result in damage

to Plaintiffs, and that Plaintiffs' damage would not have otherwise occurred.

### D.    Plaintiffs' damages are as follows:

191.  Plaintiffs were damaged as a direct result of TWU and President Slabach's breach. Plaintiffs seeking admission on motion to the bars of other states are unable to obtain the required certification from an existing law school. For example, the Arkansas State Board of Law Examiners requires that applicants requesting admission by motion complete a form which must be signed by the ABA-accredited law school from which the applicant received his or her degree. Similarly, the Oklahoma Board of Bar Examiners requires applicants seeking admission by motion to obtain an official transcript from the ABA-accredited institution from which the applicant received her J.D.

192.  Without an existing, ABA-accredited alma mater to maintain student records and grant certifications, Plaintiffs are unable from practicing law in other states through admission by motion without undue complications.

193.  Additionally, Plaintiffs' local job prospects are at risk, as employers often require documentation of graduation from an

accredited law school. When applying for legal jobs, Plaintiffs now find themselves being called to defend their alma mater's admissions standards, as Plaintiffs are unable to list a currently ABA-accredited school on their resumes and are prohibited from listing Texas A&M University School of Law.

## XI.  *ALTERNATIVE* CLAIM – TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

194. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

195. Plaintiffs assert that the actions by TWU constitute tortious interference with prospective contractual relations. In particular, Plaintiffs attempts to refinance student loans, seek faculty positions, and efficiently gain reciprocity admission in other states have been damaged by TWU's interference with the American Bar Association's listing of  accredited schools, in that now TWU School of Law is not listed as an accredited school.

## XII.   JURY DEMAND

196.  Plaintiffs request trial by jury of all claims.

## XIII.   PRAYER FOR RELIEF

197.  Plaintiffs respectfully pray:

A. That Plaintiff and each member of the class recover damages for the injuries that each has suffered in an amount to be determined by the evidence presented at trial, but in no event less than $5,000,000.

B. That Plaintiff and each member of the class recover costs of suit and that Plaintiffs' attorneys be awarded reasonable attorney's fees, as provided by Fed. R. Civ. P. 23(h).

C. That Plaintiff and that each member of the class be awarded any and all other relief that may be just and proper, in accordance with the claims asserted as detailed above.

Respectfully submitted this 11th day of August, 2015,

s/ Warren V. Norred
Warren V. Norred, TX Bar: 24045094
NORRED LAW, PLLC
200 E. Abram, Suite 300; Arlington, Texas 76010
O: 817-704-3984; F: 817-524-6686
wnorred@norredlaw.com
***Attorney for Plaintiffs***