ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

2015 NOV -9 PM 4:03

CLERK OF COURT

| | | |
|---|---|---|
| **KRISTIN BROWN, et al.,** | § | |
| Plaintiffs. | § | |
| | § | |
| v. | § | |
| | § | |
| **TEXAS A&M UNIVERSITY** | § | **No. 4:15-CV-613-A** |
| **SCHOOL OF LAW, et al.** | § | **CLASS ACTION** |
| | § | |

## FIRST AMENDED COMPLAINT - CLASS ACTION

### Table of Contents

First Amended Complaint – Class Action................................................... 1

I. Nature of the Case................................................................................ 2

II. Parties................................................................................................. 3

III. Jurisdiction and Venue ...................................................................... 11

IV. Class Action Allegations .................................................................... 13

V. Facts .................................................................................................. 15

VI. Claim 1 – Declaratory Judgment (Non-Infringe. & Trademark)................ 39

VII. Claim 2 – 42 U.S.C. § 1983 (Civil Action for Deprivation of Rights)....... 53

VIII. Claim 3 – Breach of Implied Contract (TWU)........................................ 57

IX. Claim 4 – Breach of Implied Contract (TAMU) ..................................... 66

X. Claim 5 – Breach of Dudy of Good Faith and Fair Dealing (TWU) ............. 73

XI. Claim 6 – Breach of Dudy of Good Faith and Fair Dealing (TAMU)......... 77

XII. Alternative Claim - Negligence......................................................... 79

XIII. Alternative Claim – Tortious Interference............................................. 84

XIV. Jury Demand................................................................................... 86

XV. Prayer for Relief............................................................................... 87

## FIRST AMENDED COMPLAINT - CLASS ACTION

1.    Plaintiffs in this action seek a declaratory judgment of trademark non--infringement and license regarding their use of A&M trademarks, 42 USC § 1983 damages for irrational discrimination, breach of duty and negligence damages for their failure to reasonably protect plaintiffs' interests when transferring Texas Wesleyan University School of Law from one defendant to the other, and contract damages against defendants for their disavowal of plaintiffs as graduates of Texas A&M University School of Law.

2.    Plaintiffs provide this amended complaint in response to defendants' motions to dismiss. The amended complaint is intended to "relate back" to the filing of the original complaint. To meet the arguments contained within those motions, plaintiffs herein add new defendants, a claim for remedy of specific performance, and provide additional specificity in the complaint to ensure that defendants can easily discern the claims made against them.

3.    This amended complaint fully incorporates by reference the appendix filed with plaintiffs' original complaint and supplements that appendix with additional recent evidence.

## I.   NATURE OF THE CASE

4.    In summer of 2013, Texas A&M University ("TAMU") purchased Texas Wesleyan University School of Law ("TWU School of Law") and renamed it the "Texas A&M University School of Law" ("TAMU School of Law")[1]. TAMU School of Law then announced it would no longer recognize pre-acquisition graduates as its alumni. This decision has damaged the disavowed graduates, who have lost the ability to easily show that their juris doctorate degrees are valid to potential employers, student loan re-financiers, and clients, as their law school is no longer easily located on many lists of accredited law schools.

5.    This suit seeks to require TAMU to recognize the disavowed graduates. TAMU could have started its own law school, but having chosen to purchase one and backdate its accreditation to 1994, capitalizing on the bar results, hours of pro bono service, and other accomplishments of its pre-acquisition graduates, TAMU should be estopped from treating pre- and post-acquisition graduates differently. Plaintiffs ask the Court to require that TAMU complete the name change

---

[1] The phrase "Law School" as used in this document refers to the law school herein identified and acquired by Texas A&M University from Texas Wesleyan University, without regard to its name at any particular time.

process it began by recognizing all its graduates in the same way, and reissue diplomas to those graduates whose history, accomplishments, and work TAMU School of Law uses for recruitment daily.

## II.   PARTIES

### A.   *Plaintiffs*

6.     Lead Plaintiff Kristin R. Brown graduated from the Law School in 2013, during which time she won the Equal Justice pro bono award with approximately 1300 hours (about 1% of the Law School's total pro bono hours). She resides in Dallas, TX.

7.     Plaintiff Charles E. Ames graduated from the Law School in 1995. He resides in Addison, TX.

8.     Plaintiff Norma A. Bazan graduated from the Law School in 2008. She resides in Fort Worth, TX.

9.     Plaintiff Maria Jackson Branch graduated from the Law School in 1998 and is currently an elected official. She resides in Houston, TX.

10.    Plaintiff Monty J. Buhrow graduated from the Law School in 2003. He resides in Hurst, TX.

11.    Plaintiff Amanda M. Coffey graduated from Law School in 2009. She resides in Denton, TX.

12.    Plaintiff Cherry L. Davis graduated from the Law School in 2002. She resides in Gig Harbor, WA.

13.    Plaintiff Payam Ghassemi Dell graduated from the Law School in 2007. He resides in Dallas, TX.

14.    Plaintiff Bryan Eggleston graduated from the Law School in 2010. He resides in Spicewood, TX.

15.    Plaintiff Janice Eggleston graduated from the Law School in 2010. She resides in Spicewood, TX.

16.    Plaintiff Jeff Fletcher graduated from the Law School first class of graduates in 1993. He resides in Quitman, TX.

17.    Plaintiff Amy Theresa Ford graduated from the Law School in 2012. She resides in Rowlett, TX.

18.    Plaintiff Kathryn Freed-Collier graduated from the Law School in 2000. She resides in New Windsor, MD.

19.    Plaintiff Julie Glover graduated from the Law School in 2009. She resides in Lucas, TX.

20.    Plaintiff Terance Grisso graduated from the Law School in 1994. He resides in Colleyville, TX.

21.    Plaintiff Patricia Donovan Henderson graduated from the Law School in 1994. She currently resides in Grapevine, TX.

22.    Plaintiff Deborah Johnson graduated from the Law School in 2005, during which time she chaired the Law Fellowship Board of Directors; recognized as a Regional Finalist in the Mediation Competition; volunteered with National Adoption Day; and volunteered with juvenile mediation. She resides in North Richland Hills, TX.

23.    Plaintiff R. Renee Jolley graduated from the Law School in 2005. She resides in Denton, TX.

24.    Plaintiff Jared Julian graduated from the Law School in 2001, where he served as President of the Student Bar Association. He resides in Dallas, TX.

25.    Plaintiff Myron Eugene Kimball, Jr. graduated from the Law School in 1996. He currently resides in Arlington, TX.

26.    Plaintiff Mark Lane graduated from the Law School in 1998. He resides in Fort Worth, TX.

27.   Plaintiff Jennifer Browning Ledbetter graduated from the Law School in 2011. She resides in Rowlett, TX.

28.   Plaintiff Adam Luck graduated from the Law School in 2013. He resides in Dallas, TX.

29.   Plaintiff Riley C. Massey graduated from the Law School in 2011. He resides in Dallas, TX.

30.   Plaintiff Venisa McLaughlin graduated from the Law School in 2003. She currently resides in Granbury, TX.

31.   Plaintiff Adam Miller graduated from the Law School in 2010. He resides in Crowley, TX.

32.   Plaintiff Roxie Roll graduated from the Law School in 1997. She resides in Stafford, TX.

33.   Plaintiff Elliott Smith graduated from the Law School in 2011. He resides in McKinney, TX.

34.   Plaintiff Kathleen Hennessey Smith graduated from the Law School in 2004. She currently resides in Southlake, TX.

35.   Plaintiff Cynthia Cooper Spigel graduated from the Law School in 2005. She resides in Dallas, TX.

36.    Plaintiff Suzanne Stevens graduated from the Law School in 2007. She resides in Denton, TX.

37.    Plaintiff Kevin Ray Walden graduated from the Law School in 1995. She resides in Spring, TX.

38.    Hereinafter, plaintiffs are collectively referred to as "Pre-Acquisition Graduates" or "Plaintiffs."

## B.    *Defendants (previously named in the Original Complaint)*

39.    Defendant Texas A&M University School of Law ("TAMU School of Law") is a component of Texas A&M University. TAMU Law is located at 1515 Commerce Street, Fort Worth, TX 76102, and may be served via any authorized agent at the same address.

40.    Defendant Andrew P. Morriss, Dean of Texas A&M University School of Law resides in Texas and is liable to plaintiffs for his actions individually and in his official capacity.

41.    Defendant Texas Wesleyan University ("TWU") is a domestic nonprofit corporation operating in Fort Worth, Texas 76105.

42.   Defendant Frederick G. Slabach, President of Texas Wesleyan University resides in Texas, and is liable to plaintiffs for his actions individually and in his official capacity.

## C.   *Defendants (added in this amendment)*

43.   Defendant Karan Watson serves as Provost and Executive Vice President for Academic Affairs of the Texas A&M University System and is sued in both her official and individual capacities.

44.   Defendant R. Bowen Loftin was President of Texas A&M University ("TAMU") during the Law School's acquisition and is sued in his individual capacity. He currently resides in Missouri.

45.   Defendant Michael K. Young became President of Texas A&M University on May 1, 2015, and is sued in both his official and individual capacities.

46.   Defendant Arik Short was Interim Dean for Texas Wesleyan University School of Law before and after it was purchased and renamed as Texas A&M University School of Law, and is sued in his individual capacity.

47.   Defendant Texas A&M University, is a component of the Texas A&M University System, is liable for contract claims as described herein and also named as a governmental entity who will be bound by any declaratory judgment issued by this Court.

48.   Defendant Texas A&M University System is parent of Texas A&M University, owner of the trademark in question in this suit, and sued for contract claims as described herein, and also named as a governmental entity who will be bound by any declaratory judgment issued by this Court.

49.   Defendant John Sharp is Chancellor of the Texas A&M University System and sued in both his official and individual capacities.

50.   Plaintiffs name the following individuals as defendants for their actions as individuals and in their official capacity as members of the Texas A&M University System Board of Regents, and holders in trust of the trademark at issue, as trademark-owner TAMU is a component of the TAMU System.  They may be served at the office of Ray Bonilla, 301 Tarrow, College Station, TX 77840-7896.

   a. Cliff Thomas, Chairman

b. Elaine Mendoza, Vice Chairman

c. Phil Adams

d. Robert L. Albritton

e. Anthony G. Buzbee

f. Morris E. Foster

g. Bill Mahomes

h. Judy Morgan

i. Charles W. Schwartz

j. Alvaro Gabriel Pereira, Student Regent

51.   Except as otherwise stated, all newly-named defendants reside or operate in Texas.

52.   Plaintiffs may refer to all of the defendants who are employees or board members of governing bodies associated with TAMU corporately as the "TAMU Defendants".

53.   Similarly, plaintiffs may refer to Slabach and TWU corporately as the "TWU Defendants."

## III.   JURISDICTION AND VENUE

54.   This court has personal jurisdiction over this class action in that:

    a. Plaintiff Kristin Brown is a resident of Texas.

    b. Defendant Texas A&M University School of Law is located in Fort Worth, Texas.

    c. Defendant Andrew P. Morriss is a resident of Texas.

    d. Defendant Texas Wesleyan University is a Texas corporation.

    e. Defendant Frederick G. Slabach is a resident of Texas.

    f. All newly-named defendants reside or operate in Texas.

55.   Plaintiffs seek a declaration of rights with respect to federal trademark laws and bring a claim for deprivation of rights. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 (federal question), 28 U.S.C. § 2201 (declaratory judgment), 15 U.S.C. § 1051, *et seq.*, (the Lanham Act), and 42 U.S.C. § 1983 (civil action for deprivation of rights).

56.   This Court has supplemental jurisdiction over Plaintiffs' state claims under 28 U.S.C. § 1367(a) because these claims are so related to Plaintiffs' federal claims which are within this Court's original jurisdiction, that the claims form part of the same case or controversy

under Article III of the United States Constitution. The claims include breach of contract, breach of the duty of good faith and fair dealing, negligence, tortious interference, and specific performance.

57. Venue is proper in Tarrant County and thus this District Court. Section 85.18(b) of the Texas Education Code states that venue for suits filed against any component or officer of the Texas A&M University System is mandatory in the county in which the primary office of the chief executive officer of the component located. Texas A&M University School of Law and Dean Andrew P. Morriss are located in Tarrant County.

58. Plaintiffs herein claim that any applicable statute of limitations on their claims is extended by the discovery rule, based on the September 12, 2013 question and answer session hosted at the Law School, and the actions as detailed herein are ongoing.

59. Alternatively, Plaintiffs herein claim that any applicable statute of limitations should be equitably tolled.

## IV.   CLASS ACTION ALLEGATIONS

60.   Plaintiff Kristin Brown brings this action on behalf of herself and all persons who graduated from the law school known as Texas Wesleyan School of Law ("TWU School of Law") from 1994 until its sale to Summer of 2013 by Texas Wesleyan University ("TWU") to Texas A&M University ("TAMU"), when the law school was renamed to "Texas A&M University School of Law" ("TAMU School of Law").

61.   Plaintiff Brown alleges on the basis of information received by the State Bar of Texas and in public forums that this class of persons consists of about 3,700 persons.

62.   All plaintiffs are from the defined class and represent all years of operation of TWU School of Law, stretching from 1994 to May 2013. This Complaint may refer to the defined class as the "Pre-Acquisition Graduates." All named plaintiffs are willing to be treated as part of the defined class but were included in this suit to show that support among the class stretches from the beginning of the Law School's history to its present. Many more individuals were willing to be named plaintiffs and will seek to join this suit if it fails to be certified as a class action.

63.    The claims set forth in this complaint are common to each class member, each of whom received a degree from the Law School prior to its purchase by TAMU and subsequent renaming.

64.    Plaintiff Brown is a proper representative of this class of persons because, as will be more fully shown below, her claims are typical of the claims of all members of the class, and these claims are not subject to any unique defenses, and no interest of Plaintiff Brown in this litigation conflicts with other class members.

65.    The claims set out below are proper for certification as a class action under the provisions of Rules 23(b)(1)(A), 23(b)(1)(B), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

66.    Plaintiffs expect to prove damages exceeding $5,000,000.

67.    The questions of law and fact common to the class predominate over any questions affecting individual members because the damages done to all proposed class members are very similar, and the proposed remedies are also similar, which include equitable relief regarding the reissue of diplomas and storage of educational records. The amount of damages is unlikely to be sufficient to warrant individuals filing suit on their own behalf. None of the class members will have unique claims,

and the defendants' defenses will generally apply to all claims and all members of the class. It is expected that the plaintiffs will develop a damage model useable to calculate damages based on the expected remaining career of each plaintiff but will be a consistent formula.

68.   The class action is superior to other methods of adjudication because there are about 3700 members in the proposed class, and individual litigation of the common issues shared by all class members would be inefficient for all parties and the judicial system.

## V.   FACTS

69.   In 1994, Texas Wesleyan University ("TWU") purchased the law school now located at 1515 Commerce Street, Fort Worth, Texas 76102 ("Law School") and obtained accreditation from the American Bar Association and level VI accreditation from the Southern Association of Colleges and Schools Commission on Colleges ("SACS"), the academic accrediting bodies which regulates the Law School's operation.

70.   On information and belief, about 3,700 people received juris doctorate degrees from the Law School while it was named Texas Wesleyan University School of Law, from about 1994 to 2013.

71.   On June 26, 2012, TAMU System, TAMU, and TWU signed a letter of intent regarding the Law School's acquisition. The letter was signed by defendants Sharp, Loftin, and Slabach, respectively. The letter of intent stated that the intended name of the Law School after the acquisition would be Texas A&M University School of Law at Texas Wesleyan University. The letter also included a commitment to honor all disclosed donor recognitions and acknowledgements.

72.   On June 29, 2012, during a special telephonic meeting, the Board of Regents of the TAMU System authorized Chancellor John Sharp and TAMU President Loftin to pursue affiliation with Texas Wesleyan School of Law. In a briefing of that agenda item, the acquired law school would be known as "Texas A&M School of Law at Texas Wesleyan University."

73.   On December 19, 2012, TWU President Frederick Slabach and former president of Texas A&M University ("TAMU") R. Bowen Loftin each notified SACS of TWU's intent to sell the Law School to TAMU in separate letters, both of them stating that "Under the proposed agreement, the school would be known as the Texas A&M University School of Law at Texas Wesleyan University."

74. On January 28, 2013, the Texas Higher Education Coordinating Board wrote to Karan Watson, Provost of TAMU, approving the request for TAMU to create a juris doctorate degree in Law, with the understanding that the institution would submit annual reports for five years confirming the institutional commitments and assessing the progress of the program implementation.

75. In a letter dated April 12, 2013, before SACS had approved acquisition of the Law School by TAMU, Loftin and Slabach wrote to inform SACS that if the acquisition was approved, TWUSL would become "Texas A&M University School of Law at Texas Wesleyan University."[2]

76. In the Teach-Out Plan and Agreement dated April 2013 and signed by defendants Slabach and Loftin, the Law School would be named "Texas A&M University School of Law at Texas Wesleyan University." In an introductory statement to the section addressing the acquisition's impact on students, the document states that TWU and TAMU agree to provide equitable treatment of all students while in the transition of the acquisition. That statement had no limiting language

[2] See App., p.42 (ECN No. 1-2, p.44).

to suggest that students who graduated in May 2013 (before the acquisition) would be treated different from those who graduated after.

77.   The Teach-Out Plan states that TAMU admission decisions are made within the respective college of the university, i.e., the newly acquired Law School governs its own admissions, and that the Law School will continue to use the Law School Admissions Council and other industry practices for admissions.

78.   In Appendix 6 of Section 8 of the TAMU-TWU Acquisition Prospectus, the Texas Wesleyan Five Year Budget Projections includes a record and expectancy of continued giving to the Law School of approximately $100,000 for 2013 and 2014, and then an annual increase of $100,000 in 2015 and beyond ($200,000 in 2015, $300,000 in 2016 and $400,000), which plaintiffs presume that current alumni gifts to the Law School are unabated (their loyalty goes with the Law School, rather than with TWU) until TAMU's fundraising ability has an impact.

79.   Based on plaintiffs' belief and understanding, TWU held millions of dollars donated by Law School alumni prior to its acquisition, and though those funds were provided by Law School alumni to TWU, TWU gave those funds to TAMU as part of the acquisition.

80.   On April 15, 2013, TAMU submitted a substantive-change prospectus ("Prospectus") to SACS regarding TAMU's purchase of the Law School.

1) Page three of the Prospectus states:

To maintain the current law school status as an ABA approved law school, TWUSL must receive acquiescence for this administrative change by the ABA. TWUSL submitted its formal request on December 5, 2012. A decision by the ABA on TWUSL's request is anticipated in August, 2013 . . . . Because no substantive change in faculty, students, curricula, libraries, IT, finances or facilities will occur in this acquisition, we believe we will qualify for acquiescence from the ABA with a determination that *it is the same law school*. We are committed that no student be caught in a situation where they would not graduate from an ABA-accredited program.

(Italics added for emphasis.)

2) Page four of the Prospectus states:

The merger will also benefit TWUSL, its students, *alumni*, faculty, and staff. The law school will become part of TAMU, which is ranked among the top 20 national public research universities, is a member of the Association of American Universities (AAU), is one of three tier 1 universities in Texas, offers 120 undergraduate and 240 graduate degrees, and has an endowment in excess of $5 billion. Law students and faculty would benefit from the possibilities . . . .

(Italics added for emphasis.)

81.   In an addendum to the Prospectus dated April 19, 2013, Pamela R. Matthews, Vice Provost for Academic Affairs for Texas A&M

University and presumably an agent for defendants Provost Karan Watson and President Loftin, TAMU requested an exemption to transfer rules to allow students of the Law School to receive TAMU degrees without receiving at least one-third of their credits from TAMU. The requested exemption did not request permission to reissue diplomas to pre-acquisition graduates, plaintiffs in this action.[3]

82.    Rule 20(a)(4) of the ABA Standards for Approval of Law Schools 2013-2014 states that "[a]cquiring or merging with another university by the parent university where it appears that there may be substantial impact on the operation of the law school" amounts to the closure of an approved law school and the opening of a different law school. If a change of this nature occurs, SACS must give notice to the law school and recommend to the ABA that any acquiescence in the proposed structural change be accompanied by a requirement that the school apply for provisional approval under Standard 102 and Rule 4.

83.    On August 2, 2013, Texas Wesleyan University and Texas A&M University entered into an Asset Purchase Agreement ("APA") for the purchase of the Law School.

---

[3] See Appendix, p.1-2 (ECN Doc. 1-2).

1) Section 2.1(xv) of the APA shows that TAMU purchased TWU's "Books and Records," a term defined by the APA's section 1.1 to include alumni records and student files, social media accounts related to the Law School, as well as all goodwill related to the Law School as a going concern.

2) In the APA at section 4.2, TAMU purchased all of the assets necessary for, or material to, the ownership and operation of the Law School. At the least, those assets would include a license to use Plaintiffs' student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

3) Specifically excluded from the APA, and retained by TWU, were all student receivables of the Law School in existence as of the closing date that were attributable to the 2013 Summer semester or any prior semester and all causes of action pertaining to the collection of the student receivables. TWU retained the right to collect on student receivables pursuant to sections 2.1(a)(i) and 2.3 of the APA, but failed to include any other provision in the APA that would protect the rights and privileges of Plaintiffs' degrees.

84.    On August 8, 2013, the Texas A&M Board of Regents members ratified the agreements with TWU concerning TAMU School of Law with the defendant regents voting unanimously in favor.

85.    The August 12, 2013 letter from the American Bar Association to TWU and TAMU approving the sale of the Law School states in part: "The proposed acquisition of the Texas Wesleyan University School of Law by Texas A&M University does not amount to the closure of an approved law school and the opening of a different law school within the meaning of Rule of Procedure 20(b)."

86.    On August 12, 2013, TWU and TAMU executed a Bill of Sale confirming the terms of the Asset Purchase Agreement.

87.    On September 12, 2013, the Law School hosted a question and answer session at the Law School in which its representative defendant Watson stated, "We got a one-time exception for those students who are currently enrolled who will graduate in December that they could have less than one-third of their hours from Texas A&M and still get a degree . . . That's as far as we were able to get the [accrediting body] to bend."[4]

---

[4] Video of the Q&A session is available in its entirety here:
https://www.youtube.com/watch?v=VMpPtP_PRjo&list=WL&index=7

88.   According to a February 2014 article published by FW Weekly, when SACS President Belle Wheelan was asked about the claimed request for a waiver, she reportedly stated that said she did not recall TAMU asking for any waivers and that diploma reissuance "is not an accreditation issue; that is the university's issue."[5]

89.   In the FW Weekly article, Dr. Wheelan further remarked, "What would have happened once the two institutions merged, then Texas A&M's name would go on that diploma because that was the school that was granting the degree now."

90.   For the Pre-Acquisition Graduates, Dr. Wheelan said that SACS has "no prohibition against putting both [school] names on the diploma. They could do that."

91.   Despite refusing to recognize Pre-Acquisition Graduates as alumni of Texas A&M University School of Law, the Law School continuously uses the accolades of Pre-Acquisition Graduates, including bar-passage rates and employment statistics[6], in advertisements and publications.[7]

---

[5] See http://www.fwweekly.com/2014/02/26/aggie-vanishing-act/, p.2.
[6] See App. p.9-12 (ECN No. 1-2, p.11-14).
[7] Bar-passage rates are viewable in vol. 30, no. 34 of *Texas Lawyer* magazine at http://viewer.zmags.com/publication/318b1ba7#/318b1ba7/25

92.   As an example of TAMU's arbitrary and capricious behavior, TAMU allowed at least three individuals to graduate and obtain TAMU law degrees and other benefits by turning in their pro bono records only after the Law School's acquisition. These individuals took no classes after the acquisition of the Law School. Kristen Brown finished her coursework at the exact same time as these other individuals, and recorded more than 1000 hours of pro bono work (*more than thirty times the 30 hour requirement*), but because she turned in her hours timely, TAMU has proclaimed that she did not graduate from TAMU and has not earned a TAMU degree, while the other individuals did earn the degree by turning in their records late. And while TAMU is denying Brown's ability to point to an open and accredited law school to which she attended as her law school alma mater, TAMU Law School's Interim Dean Arik Short proudly took credit for Brown's 600+ hours after the Law School acquisition in a statement made on November 13, 2013, when accepting an award on behalf of the law school stating, "To date, Texas A&M law students have provided more than 120,000 hours of pro bono legal services which equates to more than $2.4 million in

total legal services given to the community." This statement was memorialized in a November 13, 2013 press release.[8]

93.   The 120,000 pro bono hours claimed by TAMU includes hours performed by the Pre-Acquisition Graduates. Kristin Brown performed close to 1% of the reported pro bono hours for entire school population during its entire existence, and TAMU refuses to recognize her as one of its graduates, though it does recognize as graduates those students who delayed turning in their 30 hours from May 2013 until after the acquisition.

94.   In addition, some senior-level TWU School of Law students had sufficient credits to sit for the bar exam before they graduated from the law school. By arbitrarily deciding not to recognize the Pre-Acquisition Graduates, the Texas State Bar has recognized some law students as graduates of TAMU School of Law, and others as graduates of TWU School of Law, though they took and passed the bar at the same time.

---

[8] See Appendix, p. 8 (ECN Doc. 1-2). The statement is available in its entirety on the website for Texas A&M University School of Law: https://law.tamu.edu/media/news-media-resources/story/law-school-awarded-for-smart-moves (confirmed on November 7, 2015).

95.   TAMU and TWU have confused their reporting to the Texas State Bar, with some May 2013 graduates inexplicably listed on the Texas Bar as graduated from TAMU School of Law. This condition exists through no fault of those graduates, but TAMU Provost Karan Watson has stated that such use is wrong. As there exists no simple solution for updating or correcting the state bar records, and those records reflect reports provided to the State Bar from TWU and TAMU, those graduates must go out of their way to explain the entire story to would-be employers. Should the administration of TAMU decide to sue on misuse of its trademark, those students would, at the least, have to prove that they were not responsible for the infringement.

96.   A page of TAMU School of Law's website titled "Careers and the Aggie Network" features the employment statistics for the class of 2012, prior to the acquisition.[9]

97.   In Vol. 1, Issue 1 of *The Aggie Lawyer*, the inaugural alumni magazine published by Texas A&M University School of Law, pages 25 to 33 boast the accomplishments of graduates ranging from 1993 to

---

[9] *See* App., p.9-10 (ECN. Doc. 11-12).

2013, including Plaintiff Brown (p.33). A true and correct copy of an excerpt of the magazine is attached to this Original Complaint.[10]

98.    Also displayed in the above-mentioned magazine at page 24 is an announcement regarding the yearly trip to be admitted to the United States Supreme Court that the Office of Marketing & External Affairs offers to graduates who have been licensed for at least three years. Yet, according to the Law School's public position, TAMU School of Law has zero graduates who have been licensed for at least three years. This offer is also routinely advertised to Pre-Acquisition Graduates by email. A true and correct of an excerpt of the magazine is attached to the Original Complaint as Exhibit E.

99.    In its 2013 Standard 509 Information Report that is required of all law schools accredited by the American Bar, TAMU School of Law states that it has been ABA-approved since 1994, and includes bar passage history since 2010. The 2013 report is available as a link from the front page of the TAMU School of Law.[11]

------

[10] See App., p. 11-12 (ECN. Doc. 13-14); this document has been removed from online viewing since plaintiffs have referenced it in their Original Complaint.
[11] https://law.tamu.edu/docs/default-source/prospective-student-documents/std509inforeport-2013.pdf?sfvrsn=2

100. Contrary to the TAMU's ABA disclosures, public statements regarding the Law School now claim it was founded in 2013, ignoring the first twenty years of its existence. The latest example comes from the Texas Bar Journal, which explicitly states that the Law School was founded in 2013, and ignores any existence of the Law School prior to that date.[12]

101. TAMU School of Law disallows unsanctioned use of its marks, listing Collegiate Licensing Company as a licensing agent, and refers to TAMU's general rules at trademarks.tamu.edu. Further, TAMU provides strict instructions on the use of its marks at http://tamulawtest.ddns.net/docs/default-source/faculty-documents/tamulaw_brand_guidelines.pdf?sfvrsn=2.

102. TAMU and its subsidiaries own many trademarks, including the text mark "Texas A&M University" (Reg. No. 2273374) and the graphical seal (Reg. No. 1962785) which are found on every diploma issued by a TAMU subsidiary.

---

[12] See http://mydigimag.rrd.com/publication/?m=21412&l=1, or alternatively, http://mydigimag.rrd.com/display_article.php?id=2306042&id_issue=278019.

103. TAMU has a practice of jealously guarding its marks, and asks its community to help guard its marks by providing an easy method of reporting misuse of A&M marks by a website page giving simple instructions and an email link.[13]

104. On information and belief, any Pre-Acquisition Graduate who attempted to claim graduate status from TAMU School of Law would face legal action from TAMU for trademark infringement.

105. Pre-Acquisition Graduates have requested reissued degrees from TAMU School of Law, but have been told that the Law School will not reissue degrees with the new name that is on the front of its building, on its newly remodeled web site, and on all other public documents.

106. In response to the renamed TAMU School of Law's refusal to reissue diplomas to Pre-Acquisition Graduates, more than 500 Texas Wesleyan University School of Law alumni signed a petition ("Petition") asking that TAMU reconsider its 2013 decision not to reissue corrected diplomas to its alumni who graduated prior to the purchase.

107. The Petition was delivered to the Law School, Texas A&M University Interim President Mark Hussey, Board of

---

[13] See http://trademarks.tamu.edu/reportViolation.html

Regents, American Bar Association, Texas State Bar, and Texas Legislature on behalf of the Petition's signers.

108. Concurrent with the Petition, a dozen Pre-Acquisition Graduates put together a complaint to the American Bar Association ("ABA Complaint"). The ABA Complaint cites troublesome issues that Pre-Acquisition Graduates have faced as a result of TAMU's refusal to grant earlier requests for corrected degrees, including reciprocity delays and the reality that Texas Wesleyan University School of Law is no longer listed on the drop-down menus found in many Internet forms used for the automation of legal processes. Examples include the following:

1) The Law School Admission Council uses a drop-down menu for those enrolling in an LLM program which no longer includes "Texas Wesleyan School of Law", which appears as shown below:[14]

---

[14] App., p. 13 (ECN Doc. 1-2, p. 15).



2) The American Bar Association also uses a drop-down menu in its Employment Summary Report webpage which no longer contains an option to choose TWU School of Law, but has an option to choose TAMU School of Law's employment records dating back to 2010, three years prior to the Law School acquisition, but which

uses employment records from Pre-Acquisition Graduates. The menu appears as shown below:[15]



109. In July, 2014, Plaintiffs gave notice to the ABA that, in light of Rule 20(a)(4) of the ABA Standards for Approval of Law Schools 2013-2014, TAMU's acquisition of the Law School created a substantial, rather than a mere administrative, impact on the operation of the Law School by filing a complaint with the ABA describing TAMU's refusal to

---

[15] See App., p.14 (ECN Doc. 2-1, p.16). This view of the ABA's webpage can be replicated at http://employmentsummary.abaquestionnaire.org/.

recognize the alumni status of Pre-Acquisition Graduates by reissuing diplomas ("ABA Complaint").[16]

110. The American Bar Association issued a response to Plaintiffs' ABA Complaint, stating it did not act regarding student-school disputes, but was limited to the approval of law schools.

111. Plaintiffs have attempted to resolve this issue amicably by discussion with TAMU School of Law personnel, petitioning TAMU School of Law, the Board of Regents, and the American Bar Association.

112. Plaintiffs continuously receive emails from TAMU as though they were alumni of TAMU Law. Plaintiffs have received emails from the TAMU Association of Former Students and TAMU School of Law asking Plaintiffs to add their names to the directory of former students. Plaintiffs have received emails from the Office of Gift Planning soliciting donations from Plaintiffs.

113. Plaintiff Brown's current profile on the Texas Bar's website reports that her law school was "Texas Wesleyan University," a law school that appears to be no longer accredited. However, the Law School did not lose its accreditation or cease to exist. In fact, the SACS 2013

---

[16] See App., p. 15-39 (ECN Doc. 201, p.17-41).

Roll of Accredited and Candidate Institutions states that 2013 is the initial accreditation date of TAMU's level VI accreditation. The Roll additionally states that TAMU's level VI accreditation was gained from a separate accredited institution, and that prior to 2013, the institution was listed as a different entity.

114. In spite of TAMU's later statements that Pre-Acquisition Graduates are not TAMU School of Law alumni, TAMU agents changed all of the social media references to reflect the name change in the summer of 2013, suggesting that the decision to disavow plaintiffs and the rest of the putative class members had not yet been made. Plaintiffs and the putative class members simply woke up one morning to find that on their LinkedIn and Facebook pages, TAMU School of Law had replaced TWU School of Law on their profile. Some individuals since that time have edited their profile to go back and choose the old name, but that is a deliberate decision on the part of each individual graduate.

115. Throughout the acquisition process, the Pre-Acquisition Alumni have been told that the Law School desired continued input and support from them for the Law School.

116. Plaintiffs were informed during their admission process that they would be able to continue to obtain after-hours library cards for use at the Law School after they graduated. Prior to the Law School's acquisition, Plaintiffs were told that that the Pre-Acquisition Alumni would continue to have this access after the Law School's acquisition. Even *after* the acquisition during the Q&A Session on September 12, 2013, conducted by defendants Interim Dean Short and Watson, Short again promised that the Pre-Acquisition Alumni would continue to have this access. However, more than two years later, the Law School refuses to issue library cards giving the promised access. Post-acquisition alumni receive this access, leading to the obvious conclusion that the Law School has broken its promise.

117. Plaintiffs also reasonably believed, based on industry practices of higher education, that the Law School would maintain records of its graduates so that potential employers and clients can locate and verify that they attended a law school that has not failed, and that TAMU School of Law would continue to honor the special relationship that educational institutions have with their graduates.

118. Based on the statements made during the Q&A Session, Plaintiffs have no assurance that, as soon as the Standard 509 reports, salary reports, and other public documents no longer require reference to the records of the Pre-Acquisition Graduates, TAMU School of Law will simply drop all support of the Pre-Acquisition Graduates.

119. TAMU School of Law's failure to continue servicing its graduates has other real impact, as individuals have worked with lenders to refinance their law school loans, only to find out the lender could not find TWU School of Law on the accredited list. Therefore, these graduates could not go further with that lender and would have to start over with another.

120. Pre-Acquisition Graduates also suffer from the inability to show potential employers that their law school still exists. For example, in one faculty recruiting service, users can select TWU School of Law from the drop-down menu of law schools, but then the potential employer is given the information without a means of explaining that the school still exists and that it has merely been acquired and renamed.

121. At the time that Plaintiffs accepted TWU's offer of enrollment and began paying tuition, Plaintiffs reasonably expected that the law

degrees they were to receive from TWU would come with all of the rights and privileges as any other ABA-accredited degree as is customary in the industry. These rights and privileges include the ability to reference the degree-granting institution on applications for reciprocal admission to other state bars and to list an ABA-accredited institution on Plaintiffs' resumes, and the reasonable expectation that TWU would take measures to ensure that its graduates could easily validate their degree within the legal community without an extensive discussion about the matter every time the issue arises.

122. Plaintiffs seeking admission on motion to the bars of other states are unable to obtain the required certification from an existing law school. For example, the Arkansas State Board of Law Examiners requires that applicants requesting admission by motion to complete a form which must be signed by the ABA-accredited law school from which the applicant received his or her degree. Similarly, the Oklahoma Board of Bar Examiners requires applicants seeking admission by motion to obtain an official transcript from the same ABA-accredited institution which issued the applicant's J.D.

123. Plaintiffs and the putative class members can surmount these issues, but the tasks are far more complicated than the simple process which Plaintiffs enjoyed prior to the acquisition, and which thee Post-Acquisition Graduates still enjoy.

124. Additionally, plaintiffs' local job prospects are at risk, as employers often require documentation of graduation from an accredited law school. When applying for legal jobs, plaintiffs now find themselves being called to defend their alma mater's admissions standards, as plaintiffs are unable to list an ABA-accredited school on their resumes and are prohibited from listing Texas A&M University School of Law.

125. As an example of how TAMU has acted in the past, it renamed Baylor University School of Dentistry to "Texas A&M University Baylor College of Dentistry" when the dental school became part of the Texas A&M Health Science Center.

126. As another example, East Texas State alumni received replacement diplomas when that school was acquired by the TAMU System and became Texas A&M University-Texarkana.[17]

127. Andrew Morriss became Dean of Texas A&M University School of Law after the acquisition, but has continued to support the Law School's continuing breach of its duties to the Pre-Acquisition Graduates, including the ongoing decision not to grant the library after-hours card access, failure to honor the Law School's duty to take reasonable steps to ensure that Pre-Acquisition Graduates can find the name of their alma mater on the regular online menus.

## VI.   CLAIM 1 – DECLARATORY JUDGMENT (NON-INFRINGEMENT AND LICENSE OF TRADEMARK)

128. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

129. Plaintiffs file this claim against the TAMU Defendants for a declaration of rights with respect to federal trademark laws, over which

---

[17] http://www.tamut.edu/admissions/Enrollment-Services/Registrar/pdf/Replacement-Diploma-Application-Form.pdf

the court is given jurisdiction by 28 U.S.C. §§ 1331 and 1338 (trademark federal question), and 28 U.S.C. § 2201 (declaratory judgment).

130.  Plaintiffs make this claim against all of the TAMU Defendants in their official capacity, and also against defendants Arik Short, Karan Watson, R. Bill Loftin, and John Sharp in their individual capacities.

131.  Plaintiffs seek the Court's declaration that the law requires that TAMU Defendants treat Pre-Acquisition Graduates just as it does post-acquisition graduates, particularly with regard to the Law School's marks and duties of the Law School with respect to all its graduates, issuing diplomas and recognizing plaintiffs as alumni of the TAMU School of Law and allowing plaintiffs to identify as TAMU School of Law alumni.

132.  The dispute is an actual controversy ripe for adjudication based on the "totality of the circumstances" standard:

    a. Plaintiffs are using the registered mark in commerce in various third-party publications to describe their education and in advertising, such as the Texas Bar Journal, LinkedIn, Facebook, and the State Bar of Texas.

b. Plaintiffs have also requested reissued diplomas with the Law School's new name, and those requests have been denied.

c. TAMU School of Law hosted a question-and-answer session directed at the Pre-Acquisition Graduates on September 12, 2013, ("Q&A Session") in which Dr. Karen Watson described the Law School's position to be "unbendable," while stating that the Pre-Acquisition Graduates would not be considered alumni of TAMU School of Law, and Pre-Acquisition Graduates would not be able to obtain reissued diplomas or be called graduates of TAMU School of Law.

d. TAMU School of Law requires permission to use its marks, publishing a brand guide on its web site at: http://tamulawtest.ddns.net/docs/default-source/faculty-documents/tamulaw_brand_guidelines.pdf?sfvrsn=2. disallows unsanctioned use of its marks, giving Collegiate Licensing Company as a licensing agent, and refers to the general rules of TAMU's rules at trademarks.tamu.edu.

e. TAMU School of Law uses the trademarks of Texas A&M University, including the text mark "Texas A&M University"

(Reg. No. 2273374) and graphical seal (Reg. No. 1962785) which are found on every diploma issued by TAMU School of Law.

f. After its acquisition, the Law School replaced signage on the front of its building, remodeled its web site, and removed its former name from many other third-party listings with professional impact, such as the Law School Admission Council and American Bar Association sites; plaintiffs can no longer find the name of an accredited law school from which they received their degree.

g. While TAMU School of Law denies that the Pre-Acquisition Graduates are its alumni, TAMU School of Law presents the salary of those same graduates in its Standard 509 reports with the American Bar Association under its own name and the no records for Wesleyan University School of Law exist. Even more telling is the existence of employment records for TAMU School of Law's 2010 graduates, though TAMU claims that the Law School was founded in 2013.[18]

---

[18] App., p.14 (ECN Doc. 2-1, p.16); the report is also available online at http://employmentsummary.abaquestionnaire.org/, where employment records are publicly available for the last five years; TAMU School of Law reports employment records for its alumni for 2010 to the present.

h. TAMU has filed suits to protect its trademarks, and Plaintiffs reasonably believe that if Plaintiffs ordered or created their own diplomas without sanction from the Law School, or claimed to be graduates of TAMU, they would face suit for trademark or copyright infringement.

i. In addition to action by TAMU School of Law, any attempt to create or order an appropriate replacement degree would likely result in action by the Texas Attorney General's office, which regularly acts against what it deems to be illegal diplomas swiftly and aggressively. *See, e.g., State v. Lincoln Academy*, No. 2014-14329 (295th Dist. Ct., Harris County, Tex. Aug. 4, 2014).

j. Plaintiffs reasonably believed based on Defendants' representations that they would be able to obtain an after-hours library card for use at the Law School, but that promise continues to be unfulfilled, nearly two years after the acquisition. To create their own library cards, Plaintiffs would have to violate Defendant TAMU School of Law's marks.

k. The Law School has removed its pre-acquisition name from use with the Law School Admission Council, so that a Pre-Acquisition

Graduate has no ability to choose "Texas Wesleyan School of Law" from the drop-down menu when registering for LLM programs. The current menu now appears as follows:



a. As another example, in matriculating to the Law School initially, plaintiffs reasonably believed that if they earned their juris doctorate degrees, they would be licensed by the Law School and able to fill out regular forms like the one above in the ordinary

manner as all other graduates of all other accredited Texas law schools do, and as plaintiffs did until the Law School's acquisition by TAMU.

b. Plaintiffs also reasonably believed, based on industry practices of higher education, that the Law School would maintain records of its graduates so potential employers and clients can verify that they attended a law school that has not failed, and that TAMU School of Law would continue to honor the special relationship that educational institutions have with their graduates.

c. The TWU and TAMU Defendants agreed in an Asset Purchase Agreement ("APA") between them that, among other assets, TAMU purchased TWU's Books and Records, including alumni records, student files, social media accounts related to the Law School, as well as all goodwill related to the Law School as a going concern and all related endowments.

d. In the APA at 2.1, TAMU purchased all of the assets necessary for, or material to the ownership and operation of the Law School. At the least, those assets would include a license to use Plaintiffs'

student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

e. Based on the statements made during the Q&A Session, Plaintiffs have no assurance that, as soon as the Standard 509 reports, salary reports, and other public documents no longer require reference to the records of the Pre-Acquisition Graduates, TAMU School of Law will not simply drop *all* support of the Pre-Acquisition Graduates.

133. Plaintiffs contend that the Law School has an obligation to honor an uphold the traditional duties of an educational institution with respect to the Pre-Acquisition Graduates based on the following:

a. TWU School of Law did not lose its accreditation or cease to exist; the American Bar Association list of accredited schools lists TAMU School of Law with an accreditation date of 1994, and all acquisition documentation states specifically that TAMU School of Law is a mere acquisition of a law school as an ongoing concern and renaming, and *not* the closing of TWU School of Law with a new TAMU School of Law built with the previous school's assets.

b. TAMU School of Law was not listed as an accredited law school until 2013, and then suddenly appears with the accreditation date of 1994; TWU School of Law was listed as an accredited law school until TAMU School of Law was listed. If TAMU School of Law was retroactively recognized as accredited in 1994, then all of the Pre-Acquisition Graduates must be recognized as after-the-fact graduates of TAMU School of Law.

c. The Prospectus provided by TAMU and TWU to the Southern Association of Colleges and Schools ("SACS") during the approval process, TAMU states that this is not a new law school, as copied below (underlining added):

> To maintain the current law school status as an ABA approved law school, TWUSL must receive acquiescence for this administrative change by the ABA. TWUSL submitted its formal request on December 5, 2012. A decision by the ABA on TWUSL's request is anticipated in August, 2013 (see paragraph above). Because no substantive change in faculty, students, curricula, libraries, IT, finances or facilities will occur in this acquisition, we believe we will qualify for acquiescence from the ABA with a determination that <u>it is the same law school.</u> We are committed that no student be caught in a situation where they would not graduate from an ABA-accredited program.

d. Page four of the Prospectus states:

> The merger will also benefit TWUSL, its students, <u>alumni</u>, faculty, and staff. The law school will become a part of TAMU, which is ranked among the top 20 national public research universities, is a member of the Association of American Universities (AAU), is one of three tier 1 universities in Texas, offers 120 undergraduate and 240 graduate degrees, and has an endowment in excess of \$5 billion. Law students and faculty would benefit from the possibilities

e. In a letter to SACS dated April 12, 2013, just months before the acquisition, Defendants stated:[19]

> If approved, TWUSL would become "Texas A&M University School of Law at Texas Weslayan University."

f. On December 19, 2012, President of Texas A&M University Dr. Bowen Loftin sent a letter to SACS President Dr. Belle Wheelan, stating (underlining added):

g. The American Bar Association also approved the acquisition with the understanding that the result would not be a new school:[20]

> (3)    The proposed acquisition of the Texas Wesleyan University School of Law by Texas A&M University does not amount to the closure of an approved law school and the opening of a different law school within the meaning of Rule of Procedure 20(b).

h. On September 24, 2013, TAMU agent Pam Matthews received an email from Cheryl Cardell, a vice-president of the Southern Association of Colleges and Schools, which was later procured through a freedom-of-information request, and follows:

> Since the acquisition of the law school by Tx A & M University is not retroactive, degrees earned at the law school before that time are Texas Wesleyan University degrees and should remainTexas Wesleyan University degrees.

---

[19] App, p.42 (ECN No. 1-2, p.44).
[20] App. p.43 (ECN No. 1-2, p.45).

There is no explanation or background for the email, which was sent shortly after the Q&A Session in which TAMU School of Law agents informed the Pre-Acquisition Graduates that TAMU was not legally able to issue degrees, and appears to be contrived to support TAMU's position. However, the relevant reasoning is that Ms. Cardell is stating that TWU degrees should remain TWU degrees because the acquisition is not retroactive. Plaintiffs would point to the 1994 accreditation date claimed by TAMU School of Law and assert otherwise.

i.  In the Disclosure Schedules to the APA, TAMU assumes more than thirty pages of listed executory contracts, indicating that TAMU purchased an ongoing concern, rather than just buying assets of a defunct business, and states that it is purchasing a going concern in several places.

j.  TAMU School of Law has touted that the Law School's alumni have performed 120,000 pro bono hours. This number necessarily includes the thirty hours that each Pre-Acquisition Graduate has performed, or the number would be inaccurate.

k. TAMU School of Law's failure to continue servicing its graduates has other real impact, as individuals have worked with lenders to refinance their law school loans, only to find out the lender could not find TWU School of Law on the accredited list, and therefore could not go further with that lender and would have to start over with another.

l. Pre-Acquisition Graduates also suffer from the inability to show potential employers that their law school still exists. For example, in one faculty-recruiting service, users can select TWU School of Law from the drop-down menu of law schools, but then the potential employer is given the information without a means of explaining that the school still exists.

m. Plaintiffs have attempted to work with TAMU School of Law, providing it with a petition containing more than 500 names, asking for resolution of the matter without resorting to the courts.

n. Plaintiffs also sought administrative resolution with the American Bar Association to ensure that all avenues of resolution were attempted.

134. Plaintiffs assert that TAMU School of Law must be run in accordance with TAMU's statements to SACS, and therefore must admit that pre- and post-acquisition graduates of the Law School should have the same marketing position, and use the most recent name and obtain new diplomas which use the Law School's TAMU marks in the same way that graduates used the Law School's TWU marks before the acquisition.

135. TAMU Defendants have claimed that it cannot reissue diplomas, but Belle Wheelan, President of the Southern Association of Colleges and Schools, has publicly stated that the decision to reissue diplomas is an internal one to TAMU.

136. TAMU Defendants have also attempted to distinguish its purchase of other academic units in which diplomas have been reissued, such as Texas A&M University–Texarkana, by arguing that in those situations, the entire institution was absorbed into the TAMU system. They have argued that, since TWU remains in business, the records and validation of previous graduates must remain with TWU. Plaintiffs see this as a meritless and meaningless distinction. The Law School's accreditation has been backdated to 1994 and assigned to TAMU. All of

the governing bodies involved in the acquisition have interpreted the transaction as a mere purchase and renaming. The president of SACS has stated openly and publicly that TAMU can reissue diplomas. There is simply no reason why the continued existence of TWU should impede TAMU from reissuing diplomas and maintaining the academic records.

137. Plaintiffs ask the Court to recognize that TAMU School of Law cannot claim the work and accomplishments of Plaintiffs while denying that they are graduates of TAMU.

138. Plaintiffs ask the Court to issue a declaration regarding the use of TAMU's trademarks, as follows: a) the Pre-Acquisition Graduates may use "Texas A&M University School of Law" as their alma mater with third parties without fear of trademark infringement claims; b) the Law School must respond to queries regarding graduation and grade confirmation regarding Pre-Acquisition Graduates in the same way that it responds to its current graduates; c) the Law School must replace diplomas upon request to Pre-Acquisition Graduates in the same way that it replaces diplomas for all other graduates.

## VII.   CLAIM 2 – 42 U.S.C. § 1983
## (CIVIL ACTION FOR DEPRIVATION OF RIGHTS)

139. Plaintiffs hereby incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

140. This is an action brought by Plaintiffs seeking declaratory relief, compensatory damages, and punitive damages against the TAMU Defendants for violations of due process and equal protection rights guaranteed under the laws of the United States and for personal and other injuries in violation of laws of the State of Texas.

141. Plaintiffs, for themselves and all those similarly situated, make this claim against all of the TAMU Defendants in their official capacity, and also against defendants Arik Short, Karan Watson, R. Bill Loftin, and John Sharp in their individual capacities.

142. Additional Jurisdiction and Venue - This action is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment, and 28 U.S.C. §§ 1331 and 1343(a).

143. Plaintiffs bring this action for the unequal and irrational treatment of Pre-Acquisition Graduates in comparison to those who have graduated since TAMU acquired the Law School.

144. The TWU School of Law operated as part of TWU from 1994 to May 2013, at which time the Law School was acquired by TAMU and then renamed "Texas A&M University School of Law."

145. All graduates of TAMU School of Law are required to perform thirty hours of pro-bono service to the community before qualifying for graduation.

146. At least three individuals delayed turning in their pro bono records until after the Law School's acquisition, thereby qualifying for the TAMU School of Law diploma and other benefits. These individuals took no classes after the acquisition of the Law School, but are considered TAMU School of Law alumni.

147. In addition, some TWU School of Law students who had sufficient credits to qualify to take the bar exam before graduation were able to take the bar exam at the same time as TWU School of Law students who had already graduated. Those students who took the bar but had not graduated yet then went on to finish their juris doctorate work after the acquisition was completed. This set of events has created a situation where a group of individuals who took the bar all the same time are being treated differently by TAMU, in that TAMU is rewarding one

group of students arbitrarily by favoring slower performers by giving them preferential treatment as degreed graduates, while denying the same to those who completed their coursework more quickly.

148. In yet other conditions, the uneven treatment has resulted in some May 2013 graduates as inexplicably listed on the Texas Bar as graduated from TAMU School of Law when the acquisition had not occurred; such use could be found to be infringement.

149. As noted *supra*, the Law School was purchased as an ongoing concern, rather than a failure of one law school and the creation of a new one using the old school's assets.

150. TAMU School of Law touts 120,000 pro bono hours of generosity provided by the Law School's alumni to the local community, a number that requires the use of the Pre-Acquisition Graduates' pro bono hours.

151. TAMU School of Law is listed as having achieved its accreditation in 1994, begging the question of where the list of the graduates from 1994 to 2013 is located.

152. The Fourteenth Amendment prevents the unequal treatment of individuals similarly situated by state actors, even if there was only one

individual being mistreated. *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

153.  Plaintiffs contend that based on Defendants' own behavior, there is no rational basis for the Law School to differentiate between pre- and post-acquisition graduates. Plaintiffs ask the Court to require Defendants to treat all of the individuals who have graduated from the Law School based on the 1994 accreditation in the same way, including but not limited to reissued diplomas, after-hour access to the Law School's law library, and confirmation of graduation and grades.

154.  Additionally, Defendants have no rational basis for treating the Pre-Acquisition graduates differently than it treated the East Texas State alumni after that acquisition.

155.  Plaintiffs have a property interest in the degrees that they were issued that have been infringed by Defendants' actions.

156.  Plaintiffs also seek an award of actual damages and attorney fees in an amount deemed appropriate by this Court pursuant to 42 U.S.C. §§ 1983-1988.

157. Dean Morriss has failed to rectify the ongoing unequal treatment of pre and post-acquistion students, and is therefore liable for the ongoing wrong-doing.

## VIII.   CLAIM 3 - BREACH OF IMPLIED CONTRACT (TWU)

158. Plaintiffs hereby incorporate by reference every allegation contained in the preceding paragraphs as if set forth fully herein.

159. This is a claim for breach of implied-in-fact contract under the Texas common law against defendants TWU and Slabach, in both his official and individual capacities.

160. Plaintiffs make this claim for themselves and all those similarly situated.

161. In addition, The Texas Sixth Court of Appeals recently summarized the  elements of an action for breach of implied  contract in *Progressive Transp., LLC v. Republic Nat'l Indus. of Tex., LP*, 2015 Tex. App. LEXIS 1065, *28 (Tex.App.-Texarkana 2015, no pet.), which stated that the elements of a contract, express or implied are identical, and the facts show that the minds met on the terms of the contract without any legally expressed agreement thereto.

162. TWU breached the implied-in-fact contract between Plaintiffs and TWU when TWU failed to take necessary actions to protect the credibility of law degrees previously issued to Plaintiffs.

163. *Elements of the claim.* A party is entitled to relief based on breach of contract when:

    A. there exists a contractual relationship between the parties,

    B. the contract supports plaintiff's right to recover,

    C. the contract is supported by consideration,

    D. plaintiff performed or tendered performance under the contract,

    E. defendant breached the contract, and

    F. plaintiff was damaged as a result of defendant's breach.

## A.  A contract exists between Plaintiffs and TWU.

164. Texas courts have said that the relationship between a private school and its student has by definition primarily a contractual basis. *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1999).

165. Where a private university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements,

abide   by   university   guidelines,   and   pay   tuition, a contract exists. *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1999); *see Smith v. Renz*, 840 S.W.2d 702,   704 (Tex.   App.—Corpus   Christi   1992,   writ   denied)   (stating an implied contract arises from the dealings of the parties, from which the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement thereto).

166. An   implied-contract   relationship   between   a   university   and   its students is supported by federal courts nationwide. *Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 649-50 (Ct. App. 2007) (holding that   an implied contract was   created   by   the   students' conduct   when they   accepted   the   University's   offer   of   enrollment).   *See, e.g., Ross v. Creighton   Univ.*,   957   F.2d 410,   417 (7th Cir. 1992); *Lyons v. Salve Regina   College*,   565   F.2d   200,   202   (1st   Cir.   1977) (terms   of contract between student and college may include statements provided in   student   manuals   and   registration   materials); *Mangla v. Brown Univ.*,   135   F.3d   80,   83 (1st Cir. 1998) (standard for interpreting contractual terms is that of *"reasonable expectation*—what meaning the party   making   the   manifestation,   the   university,   should   reasonably

expect the other party to give it") (emphasis added); *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D.Conn 2000) ("Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises ... appears sound").

167. TWU offered legal education to Plaintiffs for the purpose of obtaining ABA-recognized juris doctorate degrees. Plaintiffs based their decision to attend TWU on TWU's fact books, student handbook, catalog, and other publications containing statements of the Law School's accreditation by the American Bar Association.

168. A meeting of the minds of parties to an implied contract is inferred from and evidenced by their conduct and course of dealing. *Haws & Garrett Gen. Contrs., Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607, 609 (Tex. 1972).

169. Following their acceptance of TWU's offer of enrollment, Plaintiffs had a reasonable expectation that TWU would preserve the integrity of the juris doctorate degrees TWU issued to Plaintiffs.

170. TWU's conduct indicated that the juris doctorate degrees it issued would remain credible and recognized by third parties for as long as the Law School remained in existence. Plaintiffs acted so as to complete course requirements and remain in good academic standing, and TWU issue juris doctorate degrees to Plaintiffs upon completion of the requirements.

171. Over the twenty years prior to the acquisition by TAMU, it was never once contemplated by the parties that the degrees granted by TWU to Plaintiffs would lose their value upon acquisition by another school or by any other substantive change in the Law School. While no one promised that the Law School would even remain in existence, the Law School, while it exists, has certain duties to its graduates, even if its name changes.

172. Based on plaintiffs' understanding that they would continue to be considered alumni of the acquired school, plaintiffs forebore any negative participation in the accreditation and acquisition process. Forebearance of an action can be consideration to establish a contract. Had TWU informed plaintiffs that TWU was not protecting their interests, and that the renamed school would have no commonality with

the previous name, and the Pre-Acquisition Graduates would be disavowed as they have been, they could have opposed the acquisition approval with the various accrediting agencies. In that case, TWU may not have made the profit it did. Thus, one can see that TWU said that it was protecting interests when it was not, and benefitted by selling the law school unfettered by any stated duties to TAMU after the time had passed for alumni to be involved in the acquisition process.

173. Therefore, the acquisition process and the TWU averments of "we'll protect you through this" created a contract that TWU would actually protect alumni interests.

**B.    *The terms of the contract support Plaintiffs' right to recover.***

174. The specific terms of an implied contract must logically be defined by the college or university's policies and requirements. *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.—San Antonio 1999).

175. TWU's policies contained many statements that its graduates would receive juris doctorate degrees from an ABA-accredited school.

176. Plaintiffs predicated their decisions to attend the Law School on TWU's implied promise that, as an ABA-accredited institution, TWU would confer degrees that would continue to be valid in the future and that would hold rights and privileges comparable to any other degree granted by an ABA-accredited institution.

177. Upon admission to the Law School, plaintiffs had the reasonable expectation that the degrees they were to receive from TWU School of Law would remain valid for admission by motion to other state bars and for use in job applications without undue explanation. TWU has failed to take reasonable measures to meet that expectation, despite the continued existence of the Law School.

178. Even the American Bar Association's website does not list TWU School of Law in its drop-down menu on its webpage titled "Section of Legal Education – Employment Summary Report."[21]

179. State courts have held that custom and usage can also create specific terms by implication. *Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 649-50 (Ct. App. 2007).

---

[21] Webpage is viewable at http://employmentsummary.abaquestionnaire.org/

180.  The practices of other American universities that have undergone name changes or have been acquired by other institutions indicate that industry custom is to preserve the quality and credibility of degrees issued from the former institution. Often this is done simply by reissuing diplomas to reflect the change. Upon its transition from Mesa State College to Colorado Mesa University, the school granted its graduates new diplomas reflecting the new name of the institution. Formerly International College, Hodges University allowed graduates of International College to, for a small fee, obtain diplomas granted by Hodges University. When TAMU acquired East Texas State University, it allowed pre-acquisition graduates to purchase diplomas reflecting the new name for a nominal fee.

## C.   *The contract with TWU is supported by consideration.*

181. Plaintiffs paid tuition to TWU and completed all course requirements. TWU promised to issue ABA-accredited law degrees to plaintiffs.

182. At the time that Plaintiffs accepted TWU School of Law's offer of enrollment and began paying tuition, Plaintiffs reasonably expected that the law degrees they were to receive from TWU School of Law

would come with all of the rights and privileges as any other ABA-accredited degree. These rights and privileges include the ability to reference the degree-granting institution on applications for reciprocal admission to other state bars and to list an ABA-accredited institution on Plaintiffs' resumes without a need to explain incongruities in Plaintiffs' academic records.

183. The rights and privileges associated with the degrees conferred by TWU School of Law at the time of Plaintiffs acceptance were the basis of the bargain between TWU and Plaintiffs.

**D.     Plaintiffs fully performed under the contract with TWU.**

184. Plaintiffs paid tuition to TWU and completed all Law School and ABA requirements for receiving juris doctorate degrees.

**E.     TWU breached the contract.**

185. TWU has abrogated its responsibilities to take reasonable precautions to protect the value of plaintiff's degrees.

186. Further, TWU has failed to represent the interests of plaintiffs in the sale of the Law School, resulting in the disavowal of plaintiffs by TAMU, though TAMU has apparently received donations given to TWU

School of Law, and though TAMU School of Law touts Plaintiffs' accomplishments as its own.

## F. Plaintiffs have been damaged by TWU's breach.

187. Plaintiffs are unable to select an accredited school when applying for reciprocal admission to the bars of other states, starting an LLM process, completing online forms for faculty positions, or refinancing loans.

## G. Plaintiffs ask for damages from TWU.

188. Plaintiffs are asking the Court to award damages to plaintiffs for the diminished value of their degrees, the additional time required for plaintiffs to obtain reciprocity approval in new states, and lost income due to the need to resolve questions which must be addressed with third parties who are contracting with plaintiffs and must be fully informed about the situation caused purely by TWU's breach in this matter.

## IX.   CLAIM 4 - BREACH OF IMPLIED CONTRACT (TAMU)

189. Plaintiffs hereby incorporate by reference every allegation contained in the preceding paragraphs as if set forth fully herein.

190. This is a claim for breach of oral and implied-in-fact contract under the Texas common law against the TAMU Defendants using the model already shown in the previous section, and the additional facts and argument as stated under this section.

191. Plaintiffs, for themselves and all those similarly situated, make this claim against all of the TAMU Defendants in their official capacity, and also against defendants Andrew Morriss, Arik Short, Karan Watson, R. Bill Loftin, and John Sharp and the individual members of the Board of Regents in their individual capacities, as each one of them participated in these breaches of contract, and are continuing with the breach today.

## A.   A contract exists between Plaintiffs and TAMU.

192. TAMU spokesmen sought to reassure Pre-Acquisition Graduates during the acquisition process, making promises to engender support and eliminate any open opposition that might create uncertainty in the approval process by accreditation agencies.

193. Specifically, defendants Slabach of TWU and Loftin of TAMU signed a Teach-Out Plan and Agreement which stated that:

1) The acquired law school would become "Texas A&M University School of Law at Texas Wesleyan University."

2) "TWU and TAMU agree to provide equitable treatment of all students while in transition of the acquisition..."

3) "No substantive changes are planned with existing law school staffing and procedures in the area of student records, academic advising and counseling, financial aid counseling, and career counseling."

194. While plaintiffs do not contend that every Pre-Acquisition Graduate read and relied on the specific Teach-Out Plan referenced above, those statements accurately reflect the experience of the Pre-Acquisition Graduates, who were led to believe that they would fairly treated in this process, and would have continued after-hours access to the Law School's library. Plaintiffs contend that no reasonable person could listen or read the many pronouncements on the issue and believe that TAMU would disavow those who worked to create the law school that TAMU wanted to buy.

195. TAMU's agents brag about their fair treatment of its graduates, particularly stating multiple times before the acquisition that plaintiffs would be able to have after-hours access to the Law School's library.

### B. The contract with TAMU is supported by consideration.

196. Based on plaintiffs' understanding that they would continue to be considered alumni of the acquired school, plaintiffs forebore any negative participation in the accreditation process. Forebearance of an action can be consideration to establish a contract. Had TAMU informed plaintiffs that TAMU intended to change the name so that the renamed school has no commonality with the previous name, and disavow plaintiffs as it has, they could have opposed the acquisition approval with the various accrediting agencies.

### C.   Plaintiffs fully performed under the contract with TAMU.

197. Plaintiffs supported the approval process with accrediting agencies and did not oppose the acquisition of the Law School.

### D.   TAMU breached the contract.

198. TAMU has not performed to treat plaintiffs equitably. No reasonable person can say that TAMU's use of the performance

statistics of the Pre-Acquisition Graduates is properly met by disavowing their status as alumni. All of the named defendants associated with Texas A&M University System, Texas A&M University, and the Law School are responsible individuals who have failed even to ensure that the Pre-Acquisition Graduates can use the ordinary online menus that every attorney uses routinely without difficulty.

199. TAMU has actively ensured that plaintiffs cannot complete many of the standard forms used in everyday legal practice. Plaintiffs are unable to select an accredited school when filling out online forms that impact their ability to practiced law. These were simple tasks prior to the Law School's acquisition, and impact such processes as the application for reciprocal admission to the bars of other states, starting an LLM process, completing online forms for faculty positions, or refinancing loans.

200. Plaintiffs do not have after-hours access to the Law School library. Though this may be a minor issue, it illustrates the depth of TAMU's decision to deliberately not treat plaintiffs fairly.

## E.   Plaintiffs ask for damages from TAMU.

201. Plaintiffs are asking the Court to award damages to plaintiffs for the diminished value of their degrees, the additional time required for plaintiffs to obtain reciprocity approval in new states, and lost income due to the need to resolve questions which must be addressed with third parties who are contracting with plaintiffs and must be fully informed about the situation caused purely by TAMU's breach in this matter.

202. Plaintiffs seek an order from this Court that TAMU cooperate with TWU and amend its sale documents so that Pre-Acquisition Graduates are properly supported by TAMU School of Law, reissue diplomas, and require TAMU School of Law to treat the Pre-Acquisition Graduates as their alma mater, in exactly the same way as their post-acquisition graduates.

203. More specifically, plaintiffs are also asking the Court for specific performance with regard to the simple task of allowing plaintiffs to state that they are alumni of TAMU School of Law and choose Texas A&M School of Law on drop-down menus used in everyday legal processes, and to recognize and require TAMU to respond to queries about plaintiffs' grades and graduation data, just as it does for more recent graduates.

204. To the extent that any of the requested remedies require accreditation approval, plaintiffs request that this Court require TAMU to make a good-faith attempt to actually obtain such approval, if needed. Plaintiffs would remind the Court that defendant TAMU Provost Karan Watson openly lied in public by falsely telling plaintiffs that TAMU had requested a waiver to reissue diplomas during the question and answer session on September 12, 2013. In so doing, Ms. Watson can at least restore some faith in the Aggie Honor Code's statement that Aggies do not tolerate those who lie.

205. *Conditions Precedent.* All conditions precedent to plaintiffs' claim for relief have been performed or have occurred.

*206. Attorney Fees.* Plaintiffs retained counsel, who presented Plaintiffs' claim to Defendants. Plaintiffs are entitled to recover reasonable and necessary attorney fees in accordance with sections 38.001(8) and 38.005 of the Texas Civil Practice and Remedies Code.

207. Section 38.001(8) has been interpreted to include contracts that are implied in fact. *Bd. of Cnty. Comm'rs v. Amarillo Hosp. Dist.*, 835 S.W.2d 115, 125-26 (Tex. App.—Amarillo 1992).

208. Plaintiffs presented their claim to Defendants, but Defendants did not reissue diplomas within thirty days after the claim was presented. Therefore, Plaintiffs are entitled to recover reasonable attorney fees pursuant to section 38.001(8) for breach of contract.

## X.   CLAIM 5 - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (TWU)

209. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

210. This is a claim for breach of duty of good faith and fair dealing against TWU and Slabach in his official and personal capacities.

211. This Court has recognized that an informal fiduciary relationship may arise between a private university and a student where the student trusts in and relies upon the university. This Court recognizes a cause of action for breach of good faith and fair dealing in an informal fiduciary relationship under the Texas common law. *Colli v. S. Methodist Univ.*, No. 3:08-CV-1627-P, 2011 U.S. Dist. LEXIS 92073, at *6-8 (N.D. Tex. Feb. 14, 2011); *see Bank One, N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998).

### A.   *The parties have an informal fiduciary relationship.*

212. Some contracts involve special relationships that may give rise to duties enforceable as torts. *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston [1st Dist.] 1996). To impose a tort duty upon parties to a contract, the court must first find that a special relationship exists between them. When special confidence is placed in one who thereby obtains a resulting superiority of position and influence, a fiduciary or confidential relationship may result. The existence of a special duty in the context of a contract is not inconsistent. The special relationship may arise from the element of trust necessary to accomplish the goals of the contract, or because of an imbalance of bargaining power. *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston [1st Dist.] 1996).

213. In accepting TWU School of Law's offer of enrollment to the law school, Plaintiffs placed special confidence in TWU. Plaintiffs trusted TWU to accomplish the goal of the parties' implied contract that Plaintiffs' degrees would carry the same rights and privileges in the future as they did when conferred.

214. An informal fiduciary duty creates a common-law duty of good faith and fair dealing from which tort damages result. *Bank One, N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998).

## B.   *Defendants breached their duty.*

215. Plaintiffs do not have to show proof of actual causation or economic damage, only that TWU breached its standard of care. *Campbell v. Brummett*, No. 14-99-00750-CV, 2000 Tex. App. LEXIS 7991, at *4, 5 (Tex. App.--Houston [14th Dist.] Nov. 30, 2000, no pet.).

216. TWU and President Slabach owed a duty of reasonable care to the Pre-Acquisition Graduates to ensure that their juris doctorate degrees issued by TWU prior to the acquisition by TAMU would retain their value and integrity following the acquisition.

217. Section 2.1(xv) of the Asset Purchase Agreement shows that TWU conferred all alumni and student records to TAMU. Section 4.2 of the APA shows that TAMU purchased all of the assets necessary for, or material to, the ownership and operation of the Law School. At the least, those assets would include a license to use Plaintiffs' student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

218. TWU and President Slabach breached the duty to deal fairly with Plaintiffs when TWU and President Slabach did not act to protect the credibility of Plaintiffs' degrees.

219. A person acting in good faith and dealing fairly would have ensured that TAMU accepted a duty to validate the degrees of Pre-Acquisition Graduates or provide replacement diplomas. This easily could have been effected by including an additional provision in the Asset Purchase Agreement.

220. The practices of other American universities that have undergone name changes or have been acquired by other institutions indicate that industry custom is to preserve the quality and credibility of degrees issued from the former institution. Often this is done simply by reissuing diplomas to reflect the change. Upon its transition from Mesa State College to Colorado Mesa University, the school granted its graduates new diplomas reflecting the new name of the institution. Formerly International College, Hodges University allowed graduates of International College to, for a small fee, obtain diplomas granted by Hodges University.

221. When TAMU acquired East Texas State University, it allowed pre-acquisition graduates to purchase diplomas reflecting the new name for a nominal fee.

222. TWU failed to deal fairly when it did not include terms in the APA to ensure that the credibility of Plaintiffs' degrees would continue following the acquisition of the Law School by TAMU, or to otherwise meet Plaintiffs' reasonable expectations of being able to have their degrees validated by TAMU School of Law.

## C.   *Plaintiffs are entitled to relief.*

223. Under a claim for breach of the duty of good faith and fair dealing, Plaintiffs are entitled to damages in tort. *Bank One, N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex. App.—Houston [14th Dist.] 1998).

224. Plaintiffs seek equitable relief, asking the Court to grant an order requiring the reissuance of diplomas, which shall reflect the acquisition of the Law School by TAMU.

## XI.   CLAIM 6 - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (TAMU)

225. Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

226. Plaintiffs make this claim against all of the TAMU Defendants in their official capacity, and also against defendants Arik Short, Karan Watson, R. Bill Loftin, and John Sharp and the Board of Regents in their individual capacities.

227. This is a claim for breach of duty of good faith and fair dealing against the TAMU Defendants. This claim uses the case law as appropriate from the previous claim but concentrates only on the facts as appropriate for plaintiffs' claim against TAMU.

## A.    *The parties have an informal fiduciary relationship.*

228. Plaintiffs had a special relationship giving rise to duties between them, in that plaintiffs trusted and placed special confidence in TAMU to treat them equitably based on TAMU's own public statements, such as those made in the April 2013 Teach-Out Plan and Agreement, which led plaintiffs to remain silent during the acquisition process.

## B.    *TAMU Defendants breached their duty.*

229. TAMU have utterly failed to treat the Pre-Acquisition Graduates equitably, in that they have eliminated plaintiffs from using the standard legal processes which plaintiffs have used in the past,

including the use of its name in drop-down menus and in grade and graduation confirmations.

230. A person acting in good faith would have changed the Law School's name to "Texas A&M University School of Law at Texas Wesleyan University," which is the name that was discussed in all the approval documents, and further acted to protect the market position of the Pre-Acquisition Graduates, or just reissued degrees and grades using TAMU documents.

## C.   *Plaintiffs are entitled to relief.*

231. Plaintiffs are entitled to damages in tort.

232. Plaintiffs also ask for equitable relief, asking the Court to grant an order requiring the reissuance of diplomas, which shall reflect the acquisition of the Law School by TAMU.

## XII.   *ALTERNATIVE* CLAIM – NEGLIGENCE

233. Plaintiffs hereby incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

234. This is a claim for negligence under the Texas common law against TWU and Slabach in his individual capacity.

235. TWU and President Frederick G. Slabach breached their duty of care to Plaintiffs when TWU and President Slabach failed to take necessary actions to protect the credibility of law degrees issued to Pre-Acquisition Graduates.

236. *Elements of the claim.* A party is entitled to relief based on negligence when one party owes a duty to another and breaches that duty, resulting in damages proximately caused by the breach.

## A.   *TWU and President Slabach owed a duty to Plaintiffs.*

237. TWU and President Slabach owed a duty of reasonable care to the Pre-Acquisition Graduates to ensure that the juris doctorate degrees issued by TWU School of Law prior to the acquisition by TAMU would retain their value and integrity following the acquisition.

238. Section 2.1(xv) of the Asset Purchase Agreement shows that TWU conferred all alumni and student records to TAMU. Section 4.2 of the APA shows that TAMU purchased all of the assets necessary for, or material to, the ownership and operation of the Law School. At the

least, those assets would include a license to use Plaintiffs' student files and records, as those records are necessary to create the ABA-required disclosures found on every law school's website.

239. A person of reasonable care would have ensured that TAMU accepted a duty to validate the degrees of Pre-Acquisition Graduates or provide replacement diplomas. This easily could have been effected by including an additional provision in the Asset Purchase Agreement.

240. Furthermore, the practices of other American universities that have undergone name changes or have been acquired by other institutions indicate that industry custom is to preserve the quality and credibility of degrees issued from the former institution. Often this is done simply by reissuing diplomas to reflect the change. Upon its transition from Mesa State College to Colorado Mesa University, the school granted its graduates new diplomas reflecting the new name of the institution. Formerly International College, Hodges University allowed graduates of International College to, for a small fee, obtain diplomas granted by Hodges University. When TAMU acquired East Texas State University, it allowed pre-acquisition graduates to purchase diplomas reflecting the new name for a nominal fee.

### B.   TWU and President Slabach breached the duty.

241. TWU and President Slabach failed to exercise reasonable care to ensure that the credibility of the Pre-Acquisition Graduates' degrees would continue following the acquisition of the law school by TAMU.

242. The Asset Purchase Agreement contains provisions allowing TWU to collect on student receivables prior to the acquisition, but includes no other provisions that would protect the rights and privileges of Plaintiffs' degrees.

243. TWU failed to include a provision in the APA specifically imposing a duty on TAMU to validate the degrees of Pre-Acquisition Graduates for as long as the Law School remains operational.

244. In failing to take reasonable measures to ensure that Plaintiffs' degrees would retain their credibility following the acquisition, TWU and President Slabach breached their duty to Plaintiffs.

### C.   TWU Defendants' breach caused damage to Plaintiffs.

245. TWU and President Slabach's breach actually and proximately caused damage to Plaintiffs. But for TWU and President Slabach's failure to take reasonable steps to ensure the integrity and rights of

Plaintiffs' juris doctorate degrees issued by TWU, Plaintiffs' admissions to other state bars and applications to LLM programs through LSAC would not be jeopardized. Plaintiffs would still be able to access their student records and receive validation of their degrees from TAMU School of Law.

246.  It was reasonably foreseeable at the time of the acquisition that failing to write provisions into the Asset Purchase Agreement specifically pertaining to alumni of the Law School and degrees previously issued by the Law School might reasonably result in damage to Plaintiffs, and that Plaintiffs' damage would not have otherwise occurred.

### D.    Plaintiffs' damages:

247.  Plaintiffs were damaged as a direct result of TWU and President Slabach's breach. Plaintiffs seeking admission on motion to the bars of other states are unable to obtain the required certification from an existing law school. For example, the Arkansas State Board of Law Examiners requires that applicants requesting admission by motion complete a form which must be signed by the ABA-accredited law school from which the applicant received his or her degree. Similarly, the

Oklahoma Board of Bar Examiners requires applicants seeking admission by motion to obtain an official transcript from the ABA-accredited institution from which the applicant received her J.D.

248. Without an existing, ABA-accredited alma mater to maintain student records and grant certifications, Plaintiffs are unable from practicing law in other states through admission by motion without undue complications.

249. Additionally, Plaintiffs' local job prospects are at risk, as employers often require documentation of graduation from an accredited law school. When applying for legal jobs, Plaintiffs now find themselves being called to defend their alma mater's admissions standards, as Plaintiffs are unable to list a currently ABA-accredited school on their resumes and are prohibited from listing Texas A&M University School of Law.

## XIII. *ALTERNATIVE* CLAIM – TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

250. Plaintiffs hereby incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

251. To prevail on a claim for tortious interference with prospective business relations, a plaintiff must establish that (1) a reasonable probability existed that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. [*Hicks v. Grp. & Pension Adm'rs, Inc.*, 2015 Tex. App. LEXIS 9395, \*\*35-36 (Tex. App.-Corpus Christi 2015, no pet.).]

252. Plaintiffs make this claim against all of the defendants in their official capacities, and also against defendants Arik Short, Karan Watson, R. Bill Loftin, John Sharp, and Fred Slabach, and the Board of Regents in their individual capacities, all of whom should have known that changing the name of the law school and disavowing the graduates would damage Pre-Acquisition Graduates in the marketplace.

253. Plaintiffs assert that the actions by defendants constitute tortious interference with prospective contractual relations. In at least one case,

a Pre-Acquisition Graduate was unable to obtain refinancing of her student loans because the loan examiner was unable to confirm that Texas Wesleyan University School of Law was accredited. Plaintiffs have also struggled to get through faculty recruiting processes, and efficiently gain reciprocity admission in other states have been damaged by defendants' actions which have interfered with the American Bar Association's listing of accredited schools, in that now TWU School of Law is not listed as an accredited school. Not every plaintiff will have suffered damages for this claim, but many have.

254. All of the defendants together acted deliberately to remove the name of defendants' accredited law school from the list of ABA accredited law schools, and have given notice that plaintiffs are prohibited from claiming to be graduates of the same law school after its acquisition.

255. Plaintiffs ask for damages to reflect this interference.

## XIV.   JURY DEMAND

256. Plaintiffs request trial by jury of all claims.

## XV.   PRAYER FOR RELIEF

257. Plaintiffs respectfully pray:

A. That Plaintiff and each member of the class recover damages for the injuries that each has suffered in an amount to be determined by the evidence presented at trial, but in no event less than $5,000,000.

B. That plaintiffs and each class member recover costs of suit and that plaintiffs' attorneys be awarded reasonable attorney's fees, as provided by Fed. R. Civ. P. 23(h).

C. That plaintiff and that each member of the class be awarded any and all other relief that may be just and proper, in accordance with the claims asserted as detailed above.


Respectfully submitted this 9th day of November, 2015,

Warren V. Norred, TX Bar: 24045094
NORRED LAW, PLLC
200 E. Abram, Suite 300; Arlington, Texas 76010
O: 817-704-3984; F: 817-524-6686
wnorred@norredlaw.com
*Attorney for Plaintiffs*

CERTIFICATE OF SERVICE - I certify that a true and correct copy of the attached First Amended Complaint, together with all attachments, exhibits, and supporting papers, were served on the attorneys of record for all of the parties in this by email to the following individuals on November 9, 2015:

Drew Harris, at drew.harris@texasattorneygeneral.gov (for TAMU)
Robert Bragalone, at bbragalone@gordonrees.com (for TWU)

Warren V. Norred, TX Bar: 24045094